RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0223P (6th Cir.)
File Name: 03a0223p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DAVID L. GARRISON,
    *Plaintiff-Appellee,*

    *v.*

CASSENS TRANSPORT
COMPANY,
    *Defendant-Appellant.*

Nos. 01-6056;
02-5124

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00415—Aleta A. Trauger, District Judge.

Argued: March 26, 2003

Decided and Filed: July 7, 2003

Before: BOGGS and SILER, Circuit Judges; STEEH,
District Judge.[*]

---

[*]The Honorable George Caram Steeh, United States District
Judge for the Eastern District of Michigan, sitting by designation.

## COUNSEL

**ARGUED:** Robert L. Mercado, DEAN & FULKERSON,
Troy, Michigan, for Appellant. Kent L. Brown, Jefferson
City, Missouri, for Appellee. **ON BRIEF:** Robert L.
Mercado, Patricia M. Morrow, DEAN & FULKERSON,
Troy, Michigan, H. Rowan Leathers III, MANIER &
HEROD, Nashville, Tennessee, for Appellant. Kent L.
Brown, Jefferson City, Missouri, for Appellee.

## OPINION

SILER, Circuit Judge. In No. 01-6056, defendant Cassens
Transport Company ("Cassens") appeals the judgment after
a jury verdict in favor of plaintiff David L. Garrison in this
hybrid § 301 (29 U.S.C. § 185) breach of contract/fair
representation suit. In No. 02-5124, Cassens appeals the
order by the district court holding it in civil contempt for
failure to: immediately reinstate Garrison to employment;
make certain pension payments; and assign a "company
seniority" date that corresponds with the date that Garrison
could have commenced working for Cassens upon his return
from his worker's compensation injury. Numerous issues
have been raised on appeal. After carefully reviewing the
record, and viewing the evidence in the light most favorable
to Garrison, we find that the evidence at trial was insufficient
to establish a breach of the duty of fair representation by the
union. Accordingly, the district court erred in not entering
judgment in favor of Cassens pursuant to Rule 50 of the
Federal Rules of Civil Procedure. Also, because there was no
basis for the imposition of liability, we necessarily find that
the civil contempt order can no longer stand. Therefore, we
**REVERSE** the jury verdict and **REMAND** to the district
court for the entry of judgment as a matter of law for Cassens.

Also, the civil contempt order of January 7, 2002, is **REVERSED** and **VACATED** in its entirety.

## I.    BACKGROUND

Garrison began his employment as a driver with Allied Systems, Ltd. ("Allied") and/or its predecessor, Auto Convey, Inc., in 1980. Allied is a trucking company engaged in the auto transport business. In 1986, Garrison transferred to Allied's Smyrna, Tennessee, terminal, where he was employed as a driver until November 21, 1990, when he sustained an on-the-job injury. Cassens is also a trucking company engaged in the delivery of automobiles to vehicle dealerships in the United States. Since 1983, Cassens has maintained an operation in Smyrna, Tennessee.

Drivers for Allied and Cassens are members of Teamsters Local 327, which is affiliated with the Internal Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America AFL-CIO. Local 327 is the exclusive bargaining representative of Allied and Cassens drivers for collective bargaining purposes. Allied, Cassens, and Local 327 are signatories to a multi-employer, multi-union collective bargaining agreement referred to as the National Master Automobile Transporters Agreement ("NMATA") and the Central-Southern Areas Supplemental Agreement. NMATA governs the terms and conditions of driver employment with these companies. While employed by Allied as a driver at the Smyrna terminal, Garrison was a member of Local 327 and was covered by NMATA.

At all times relevant to this case, Nissan Motors had an assembly plant located near Allied's and Cassens's Smyrna operations. In September 1994, as a result of a competitive bid process, Nissan awarded Cassens and another trucking company, Commercial Carriers, Inc., its Smyrna transport work, which previously had been performed by Allied. Shortly thereafter, Allied notified all Allied employees working out of the Smyrna terminal, including Garrison, of

Nissan's decision to transfer its work to Cassens and Commercial Carriers. A memorandum was sent enclosing a form on which drivers could designate whether they wished to follow the work to Cassens or Commercial Carriers or stay with Allied and seek work at another terminal.

As a result of Nissan's decision to transfer its work, Allied, Cassens, Commercial Carriers, and Local 327 submitted a request to the National Joint Arbitration Committee (the "NJAC") for a determination of the seniority rights of Allied employees affected by the work transfer. The NJAC issued its decision, ruling that pursuant to NMATA, Allied drivers had the right to transfer either to Cassens or Commercial Carriers to follow the Nissan work. Regarding seniority rights, the NJAC stated that Allied's seniority list was "to be dovetailed[1] by terminal seniority[2] with the Cassens and Commercial [Carriers] Smyrna Seniority Lists."

As required by the NJAC's decision, Allied was responsible for preparing separate lists of Allied drivers seeking to transfer to Cassens and Commercial Carriers. After the NJAC decision, Garrison, who was still off work, received two letters from Allied. The first advised Garrison of his work options and stated that if he did not choose to follow the work to Cassens or Commercial Carriers he would be laid off

---

[1]Under NMATA, Art. 5, § 1 "'Dovetail seniority' is a term that is applied when two (2) or more seniority lists are merged or combined with a single seniority list which recognizes the terminal seniority date of each employee. The list is arranged by terminal seniority date with the most senior employee at the top."

[2]NMATA recognizes two different types of seniority: company seniority and terminal seniority. "'Company seniority' is a term that is applied to an employee's date of hire by the Employer." Art. 5, § 1 "'Terminal Seniority' is a term that is applied to the employee's most recent date of employment at a specific terminal." *Id.* "'Terminal' is a term that is applied to any facility of an Employer to which employees are assigned to work whether called a branch, terminal division or operation." *Id.*

from Allied, effective several days later. The second letter was a premature layoff notice.

The next day after receiving these letters, Garrison telephoned Allied's terminal manager and advised him that he wanted to follow the work to Cassens. In two follow-up letters dated November 9, 1994, Garrison confirmed his receipt of Allied's letters and restated his intentions to follow the work to Cassens. Garrison copied the letters to the business agent for Local 327.[3] Garrison's letters were both signed "Received" by James Firkus, Cassens's Smyrna terminal manger. Several days later, Garrison received notice from Allied that based upon his decision to transfer to Cassens, his name was being removed from Allied's seniority list. He was never informed that he would be required to report to work within thirty days of his notification election.

On June 7, 1996, approximately nineteen months after Garrison submitted his transfer election forms, he obtained a medical release from his doctor permitting him to return to work. That same day, he contacted Cassens inquiring into when he could begin work. The assistant terminal manager at Cassens's Smyrna terminal informed Garrison that his name did not appear on Cassens's Smyrna seniority roster and that he would need to speak with Firkus, who was on vacation. Several days later, Garrison spoke with Firkus, who stated that Garrison was not on Cassens's applicable seniority list and that it would be necessary to contact Cassens's Labor Relations Director, Joe Clark, to discuss the situation.

Garrison then went to the Local 327 office in Nashville, Tennessee, and met with Jimmy Neal, Local 327's business

---

[3] Garrison also wrote a separate letter to Local 327's now former business agent, George Barlow, informing him that he wanted to follow the work to Cassens and that he had notified Allied of this preference. In that letter, Garrison specifically asked Barlow to follow up his request to work for Cassens and to make sure that his name was placed on the seniority list at Cassens.

agent,[4] and David Hodgin, the president of Local 327, to discuss his predicament. After discussing the situation, Neal expressed his view that Garrison's case was a "slam dunk." He provided Garrison with a form so that he could prepare a grievance to be submitted to Cassens. Neal also arranged an informal meeting to be held the following day to discuss Garrison's request to return to work.

The next day, an informal meeting was held at Cassens's Smyrna terminal between Garrison, Neal, Firkus, and Mark Flett, a union steward for Cassens's employees. Firkus would not agree to put Garrison to work. According to Garrison, Firkus indicated that the problem was that Garrison had never been placed on the seniority list back in 1994. The next day, Garrison discovered that Firkus had signed for the employment notification letters he sent in November 1994. That afternoon, he confronted Firkus about his signatures. Initially, Firkus indicated that he believed the signatures were forgeries. Subsequently, he admitted it was his signature on each of the letters.

Less than a week later, Garrison submitted a grievance to Local 327, outlining his position that he had properly notified Cassens of his preference to follow the Nissan work. A local hearing was then held concerning Garrison's grievance at Cassens's Smyrna terminal. At the hearing, Neal, who was Garrison's union representative, asserted that Garrison should be permitted to work for Cassens and should be placed on Cassens's seniority list with a 1994 seniority date. Cassens took the position that it was unaware that Garrison had elected to transfer to Cassens, that his name had not appeared on any of the seniority lists or the transfer lists that had been

---

[4] In January 1995, Neal replaced Barlow as Local 327's business agent.

provided by Allied, and that Cassens did not have a contractual obligation to employ him.[5]

The parties' inability to reach an acceptable resolution to Garrison's grievance resulted in the matter's being submitted for arbitration. Neal docketed the grievance with the Southern Area Automobile Transporters Grievance Committee to be addressed at its August 1996 meeting in New Orleans, Louisiana. At Neal's recommendation, Garrison did not attend this proceeding, although Neal was present on his behalf.[6] During the proceeding, Cassens, through its representative, Joe Clark, reasserted its position that it did not have a contractual obligation to Garrison. In addition, for the first time, Cassens invoked a "30-day rule" and argued that Garrison's seniority transfer opportunity had expired because he had not reported to work at Cassens within thirty days of the transfer opportunity. At the conclusion of the proceeding, Garrison's case was referred to the National Joint Standing Seniority Committee (the "NJSSC") in Dana Point, California. It appears that at no point after the Southern Area proceeding did Neal inform Garrison that Cassens had raised the defense of the thirty-day rule. It is this somewhat obscure rule that serves as the driving force behind this litigation.

Garrison's grievance was ultimately scheduled to be heard on November 5, 1996. In preparing for this proceeding, Garrison and Neal kept in constant contact. They had several meetings and spoke on the phone almost every day. During

---

[5] At trial, Garrison's theory for Cassens's refusal to hire him was that Cassens did not want someone on the payroll who had suffered serious back injuries because of the risk of future worker's compensation claims.

[6] Neal told Garrison that nothing substantive would happen at the Southern Area proceeding and that his grievance would be scheduled to be heard by the National Joint Standing Seniority Committee in California.

this preparation stage, Garrison focused exclusively on trying to prove that he properly notified Cassens of his intentions to follow the Nissan work. Ultimately, Garrison forwarded to Neal a ten-page, ninety-seven paragraph typed presentation with twenty-eight exhibits for the upcoming arbitration. Neal reviewed the presentation and thought that it was one of the best he had ever seen.

Approximately forty-eight hours before the proceeding, Neal, Garrison, and Clark met to exchange documents and information. Garrison gave Clark a copy of his presentation and Clark gave Neal and Garrison seven prior joint arbitration committee decisions that he intended to use in support of Cassens's thirty-day defense. This appears to be the first time that Garrison was made aware of the existence of a thirty-day rule. Garrison and Neal reviewed these decisions and decided that they were not applicable or were distinguishable from the circumstances involved in the instant matter. Neal failed, however, to realize or explain the potential significance the thirty-day rule could have on Garrison's grievance. Consequently, no rebuttal--either by Neal or Garrison--was prepared on the issue of the thirty-day rule.

In presenting Garrison's grievance to the NJSSC, Neal introduced Garrison to the committee and read Garrison's grievance into the record. Garrison read a prepared statement and introduced exhibits in support of his case. Neither Neal nor Garrison made any mention or otherwise tried to obviate any argument regarding the thirty-day rule. On Cassens's behalf, Clark argued that (1) Cassens had not been notified of Garrison's intent to transfer from Allied to Cassens; (2) Garrison had never appeared on a Cassens seniority list; (3) Cassens did not have any contractual obligation to Garrison; and (4) Garrison did not comply with the thirty-day rule when he appeared for work in 1996. Clark handed committee members copies of arbitral precedent that he believed supported Cassens's position that "a man has thirty days from the date of the transfer [in] which he must make himself available." Although he did not refer to any of these

cases by name, he asserted that Cassens did not believe that it had any obligations to Garrison "under the procedures and decisions previously rendered by the Committee." Other than these brief statements and the submission of the prior committee decisions, Clark did not initially make any other arguments regarding the applicability of the thirty-day rule to Garrison's case.

Although Local 327 was free to rebut any aspect of Cassens's case, it appears that Neal completely failed to address the applicability of the thirty-day rule.[7] Garrison himself, however, put forth some rebuttal to Cassens's thirty-day rule argument, stating that "I did not believe the thirty (30)-day report rule . . . is applicable, because you will find [that] in NMATA . . . seniority shall not be broken except by discharge, voluntary quit, [or more than a seven (7)-year layoff]." After Garrison's rebuttal, one of the members of the committee asked Neal whether he had anything further to add and Neal responded, "No, sir. I don't. I think you got the case." In his final response, Clark more forcefully fleshed out Cassens's position on the applicability of the thirty-day rule:

> Mr. Garrison . . . could not report in thirty (30) days or any relevant time period. You're looking at almost two (2) years before he could report to us -- that has not been the decisions that have been rendered by this Committee and other committees. Specifically, if you go to the decisions that I handed out to you . . . [one decision] involves the very same local, Local 327. The discussion specifically talks about being able to report in thirty (30) days of the transfer. It's just one of the seven

---

**7** Cassens argues that Neal responded to the thirty-day reporting rule but alleges that the tape did not pick up all of the Neal's comments as reflected by the gap (--) noted in the transcription. We concur with the district court's view that this argument is unpersuasive guesswork on Cassens's part. It is just as likely that the gap noted in the transcription signifies a pause in Neal's rebuttal as Neal was attempting to gather his thoughts.

(7) that I gave you. Again, it specifically relates to the grievant in that particular case being on an on-the-job injury and could not report. The very same thing that we have here, gentleman. Mr. Garrison cites to you the language in the contract about seniority. We're not trying to break his seniority. All we're saying is Mr. Garrison does not belong on our seniority list, again, for all the reasons we cited to you.

Following this hearing, the NJSSC issued its decision denying Garrison's request for employment with Cassens. The committee held for Garrison on the notice issue. Specifically, it found that Garrison made a timely request to Cassens for employment and that this request was acknowledged by Cassens's terminal manager. The NJSSC found, however, that "[p]rior decisions of this Committee require that employees who follow their work . . . make themselves available for work within thirty days after expressing their desire to do so." Because Garrison was not available to work for Cassens during the applicable thirty-day period, the NJSSC found that his transfer rights were extinguished. Thus, the thirty-day rule ultimately proved dispositive of Garrison's grievance. Although the committee relied on the seven arbitral precedents submitted by Cassens in reaching its conclusion, none of the decisions specifically involved the dovetailing of seniority rights; instead, all of the cases involved attempted in-company transfers to either new terminals, new jobs, or other terminals with new work opportunities.

The one apparent NJSSC decision that presented a strikingly similar issue as that involved in Garrison's case was not brought to the committee's attention. In May 1992, Cassens previously asked the NJSSC for guidance "as to how long [Cassens] is obligated to afford work at the Avon Lake facility to an E&L Lorain driver presently on a leave of absence due to an on-the-job injury." *Cassens Transp. Co. v. Local Union No. 571 and E&L Transp. Co. Local Union 964*, No. 5-92-(2-92)-465-A. The NJSSC determined that "[w]ith

regard to the E&L employee on workers' compensation who has elected to transfer to Cassens, he is to be deemed as transferred and will hold seniority at Avon Lake and will be permitted to assume an active position upon his release from compensation status." *Id.* In light of this holding, it may have been difficult for the committee to distinguish Garrison's situation from its earlier precedent.

Thereafter, Garrison initiated a federal action under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, against Cassens, Local 327, and others. All defendants except Cassens and Local 327 were dismissed from the lawsuit. Following a settlement agreement, Local 327 was voluntarily dismissed from the suit. Thereafter, the hybrid action continued solely against Cassens. The case then proceeded to trial. At the conclusion of Garrison's case in chief and again at the close of trial, Cassens moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. The court denied the motion and submitted the case to the jury. The jury found in favor of Garrison and awarded $408,885 in compensatory damages, allocating seventy-five percent of liability to Cassens and twenty-five percent to Local 327. It also awarded $500,000 in punitive damages against Cassens. Thereafter, Cassens renewed its Rule 50 motion, which was again denied by the court. Cassens then moved for a new trial under Rule 59 of the Federal Rules of Civil Procedure, which was also denied.

In case No. 01-6056, Cassens argues that the district court erred in: (1) denying its pretrial motion for summary judgment; (2) denying its motion for judgment as a matter of law pursuant to Federal Rule 50; (3) refusing to instruct the jury on its defense that a particular section of NMATA must be considered in determining whether Cassens breached the collective bargaining agreement; (4) affirming the compensatory award when the record established that Garrison failed to mitigate damages; (5) affirming the jury's allocation of liability; and (6) upholding an award of $500,000 in punitive damages.

The district court erred in denying Cassens's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. Consequently, we need not decide the many other assignments of error raised by Cassens on appeal, which have all been rendered moot. Also, because a remedial contempt order cannot survive the reversal of the underlying order giving raise to the contempt judgment, we reverse and vacate the district court's order in case No. 02-5124.

## II.   ANALYSIS

### A.   *Denial of Summary Judgment*

Cassens argues at length that the district court erred in denying its motion for summary judgment and reconsideration pursuant to Rule 56 of the Federal Rules of Civil Procedure. However, "where summary judgment is denied and the movant subsequently loses after a full trial on the merits, the denial of summary judgment may not be appealed." *Jarrett v. Epperly*, 896 F.2d 1013, 1016 (6th Cir. 1990); *see also K&T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 174 (6th Cir. 1996) (holding that "in cases where an appellant made a Rule 56 motion for summary judgment that was denied, makes those same arguments in a Rule 50(a) motion at the close of evidence that was also denied, lost in front of a jury, then renewed its arguments in a rejected Rule 50(b) motion after the entry of judgment, we will review only the denial of the Rule 50(b) motion"). Accordingly, because there has been a trial on the merits, we will not review the district court's denial of summary judgment.

### B.   *Motion for Judgment as a Matter of Law*

Cassens moved for judgment as a matter of law pursuant to Rule 50 at the conclusion of Garrison's case in chief, at the end of trial and again after the jury's verdict. On appeal, it argues that the evidence at trial was insufficient to support the jury's finding that (1) Local 327 breached its duty of fair representation, (2) any alleged breach by the union more than likely adversely impacted the grievance process, and

(3) Cassens breached the collective bargaining agreement. "An appeals court reviews a denial of a Rule 50(b) motion *de novo*, applying the same test as the district court must apply." *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 598 (6th Cir. 2001). "We do not weigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the jury." *Wehr v. Ryan's Family Steakhouses, Inc.*, 49 F.3d 1150, 1152 (6th Cir. 1995). "Instead, we must view the evidence in the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences." *Phelps v. Yale Sec. Inc.*, 986 F.2d 1020, 1023 (6th Cir.), *cert. denied,* 510 U.S. 861 (1993). "The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant." *K&T Enters. Inc.*, 97 F.3d at 176.

In the instant case, following the jury's verdict, the district court stated that it was both "dumbfounded" and "surprised" by the result. While ruling from the bench, the court suggested that it disagreed with the verdict; however, it explained that "the law really doesn't favor setting aside a jury verdict . . . certainly not because the judge disagrees with the verdict." Our careful review of the extensive appellate record convinces us that the evidence presented to the jury was insufficient to support a finding of liability on the issue of Local 327's breach of its duty of fair representation.

### 1. *Elements of a Hybrid § 301 Action*

"A hybrid section 301 action involves two constituent claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union." *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir. 1994) (citation omitted). The two claims are "inextricably interdependent." *DelCostello v. Teamsters*, 462 U.S. 151, 164 (1983) (internal quotation marks and citation omitted). Unless a plaintiff "demonstrates both violations, he

cannot succeed against either party."[8] *Bagsby v. Lewis Bros. Inc. of Tenn.*, 820 F.2d 799, 801 (6th Cir. 1987) (emphasis omitted). In order to prove a breach of the duty of fair representation, an employee must demonstrate that the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). Each of these wrongs is mutually independent, meaning, that "the three named factors are three separate and distinct possible routes by which a union may be found to have breached its duty." *Black*, 15 F.3d at 584. "Actions for a union's breach of its duty of fair representation depend for their rationale on the union's otherwise-complete control over the handling of an employee's grievance." *Id.* "Just as . . . fiduciaries owe their beneficiaries a duty of care as well as duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 75 (1991) (citations omitted). There is no requirement, however, that the grievance process be "error-free." *Hines v. Anchor Motor Freights, Inc.*, 424 U.S. 554, 571 (1976).

With regard to the arbitrary prong, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *O'Neill*, 499 U.S. at 67 (citation omitted). Mere negligence on the part of a union does not satisfy this requirement. *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372-73, 376 (1990). Moreover, ordinary mistakes, errors, or flaws in judgment also will not suffice. *See Walk v. P\*I\*E\* Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir. 1992) (citations omitted). That is, "an unwise or even an unconsidered decision by the union is not necessarily an irrational decision." *Id.* In essence then, to prevail, a plaintiff

---

[8] It is of no consequence that Garrison has already settled with Local 327. In a hybrid § 301 suit, an "employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both." *DelCostello*, 462 U.S. at 165.

has the difficult task of showing that the union's actions were "wholly irrational." *O'Neill*, 499 U.S. at 78. The "wholly irrational" standard is described in terms of "extreme arbitrariness." *Black*, 15 F.3d at 585 ("[T]he relevant issue in assessing a Union's judgment is not whether it acted incorrectly, but whether it acted in bad faith, or extremely arbitrarily, or discriminatorily.") (internal quotation marks and citation omitted).

When reviewing a union representative's actions or omissions, we must never lose sight of the fact that union agents are not lawyers, and as a general proposition, cannot be held to the same standard as that of licensed professionals. *See Schoonover v. Consol. Freightways Corp.*, 147 F.3d 492, 497 (6th Cir. 1998) (Kennedy, J., dissenting) ("[U]nion representatives are not lawyers. They do not have the advantage of discovery procedures."), *cert. denied,* 525 U.S. 1139 (1999); *Poole v. Budd Co.*, 706 F.2d 181, 185 (6th Cir. 1983) ("Union representatives are not to be strictly held to the standards of attorneys.") (citation omitted). This observation is simply a restatement of the well-established legal understanding that: "[o]nly those important or tactical decisions made by a union official at arbitration that exhibit arbitrary or discriminatory conduct, or actions taken in bad faith, constitute breach of a duty of fair representation." *Walk*, 958 F.2d at 1326-27 (citation omitted).

Once an employee successfully demonstrates that the union acted contrary to its legal duty, the employee must then show that the union's actions or omissions "tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach." *Dushaw v. Roadway Express, Inc.*, 66 F.3d 129, 132 (6th Cir. 1995) (citation omitted). The impact of the union's breach must be substantial such that the plaintiff "must meet the onerous burden of proving that the grievance process was 'seriously flawed by the union's breach . . . .'" *Black*, 15 F.3d at 585 (quoting *Hines*, 424 U.S. at 570).

#### a.    *Union's Breach of its Duty of Fair Representation*

Garrison's allegation of breach against Local 327 can be separated into two categories: (1) those actions concerning the failure to ensure that Cassens was notified of Garrison's intent to follow the Nissan work, and (2) those actions concerning the failure to prepare for and challenge Cassens's argument as to the thirty-day reporting rule. The first category cannot give rise to liability.[9] Accordingly, our focus shifts to the second. Garrison primarily points to three errors in the union's handling of the issue of the thirty-day rule to support a finding of arbitrary conduct. First, he argues that it was arbitrary conduct for Neal not to notify Garrison that Cassens had raised a new defense at the August 1996 proceeding in New Orleans. Second, Garrison maintains that Neal's failure to prepare a rebuttal in anticipation of Cassens's thirty-day rule defense amounted to arbitrary conduct. Last, he argues that it was also arbitrary behavior for Neal not to argue against the applicability of the arbitral precedent relied on by Cassens at the NJSSC proceeding in California. Although Neal acted with less than full professionalism, there was insufficient evidence from which the jury could conclude that his errors rose to the level of "extreme arbitrariness."

Neal first learned of the thirty-day rule at the New Orleans proceeding when Cassens invoked the rule as an affirmative defense to defeat Garrison's grievance. It is undisputed that prior to this hearing, and during his relatively short tenure (i.e., twenty months) as Local 327's business agent, Neal had never dealt with, or otherwise been made aware of, the little-known thirty-day rule. As Garrison himself concedes, the thirty-day "rule was one [Neal] had never heard of in all of his

---

[9]Garrison prevailed on this issue before the NJSSC and hence any alleged breach could not have tainted the committee's decision. As the NJSSC found, "Mr. Garrison made a timely request for employment consistent with this Committee's prior decision . . . and this request was acknowledged by Cassens's terminal manager, [Firkus]."

years with the union." Garrison also recognizes that at the time of his grievance proceedings, the thirty-day rule was rarely invoked and even more rarely relied on as a basis to defeat a grievance. For instance, Garrison repeatedly and boldly emphasizes that he "is the only employee in the sixty-year history of car haul who ever lost his right to be on a seniority [list] because he didn't show up within thirty days." Given the relative obscurity and deceptive unimportance of the thirty-day rule, Neal's oversight in not relaying this defense to Garrison did not amount to arbitrary conduct; at worst, the error was negligence.[10] *Cf. Walk*, 958 F.2d at 1329 (explaining that a union agent's failure to investigate adequately a grievant's case before submission to arbitration was negligent, but not in and of itself arbitrary); *Olsen v. United Parcel Serv.*, 892 F.2d 1290, 1295-96 (7th Cir. 1990) ("While we can imagine situations in which a union's failure to investigate might constitute substantial evidence of a breach, the mere failure to investigate, in itself, does not constitute a breach of the duty of fair representation.").

Approximately forty-eight hours prior to the NJSSC proceeding, Neal, Garrison, and Joe Clark of Cassens came together to swap documents that would be presented to the committee. Among the items exchanged were the seven arbitral precedents that Cassens intended to rely on in support of its thirty-day rule defense. Garrison and Neal reviewed these decisions and were of the view that the defense was inapplicable to Garrison's grievance.[11] Accordingly, Neal

and Garrison did not prepare a response to this defense. Neal's decision not to research and prepare a response to a defense that he believed was inapplicable to the grievance he was handling is a tactical decision subject to deference. After evaluating the decisions submitted by Cassens--and determining they were irrelevant or distinguishable from Garrison's claim--it was in Neal's discretion to determine how he wanted to expend his time, efforts, and resources in continuing to prosecute Garrison's grievance. If Neal determined that a change in strategy was not warranted, a conclusion that Garrison concurred with, then unless discriminatory, wholly irrational, or made in bad faith, it is not for us to second guess the wisdom of the decision. Moreover, like other contexts where we engage in *post hoc* evaluation of conduct, we must be ever vigilant to avoid the distorting effects of hindsight. Although Neal's decision not to obviate or otherwise prepare a rebuttal to the thirty-day rule

---

[10] At trial, Neal testified that he simply did not recall the thirty-day rule argument being advanced by Cassens at the New Orleans proceeding. The record indicates that at times, Neal has been in charge of sixty to seventy grievances a month.

[11] Garrison insists that there is no evidence that Neal and he evaluated the arbitral decisions provided by Cassens or that they believed that the decisions were inapplicable to his grievance. However, the record indicates that Garrison clearly testified on cross examination that both Neal and he reviewed the arbitral decisions submitted by Cassens, and

were of the view that the decisions were inapplicable to Garrison's situation. Specifically, Garrison testified as follows:

Q:     My question to you was: You [i.e., Garrison] had them on Sunday, and did you have an opportunity to look at them between Sunday and Tuesday, when the hearing takes place?
A:     The answer to your question is yes.
Q:     Okay. And you, in fact, did review those decisions, didn't you?
A:     I did look at them, yes, sir.
Q:     And Mr. Neal also looked at those decisions, didn't he?
A:     Yes, sir.
Q:     And both of you came to the same conclusion, which was that you felt, in your judgment that those decisions were different than your situation; correct?
A:     We felt that those decisions had nothing to do with our case. That's what I felt, and that's what he [i.e., Neal] told me that he felt.
                              * * *
Q:     So both you and Mr. Neal decided, after reviewing the cases and determining them to be not applicable, to go forward with the hearing on November 5th; correct?
A:     Yes, sir.

proved to be a devastating error, the error can at worst be viewed as a miscalculation of strategy. Certainly, independent research and consultation would have been the preferable course of action, particularly when such research may have uncovered the Avon Lake arbitral precedent that supported Garrison's grievance. However, as our case law makes clear, "an unwise or even an unconsidered decision by the union is not necessarily an irrational decision." *Walk*, 958 F.2d at 1326.

In *Walk*, a plaintiff brought a hybrid § 301 suit alleging that he was wrongfully discharged due to an erroneous drug test result that indicated a positive finding of marijuana. The plaintiff argued numerous errors in the union's handling of his arbitration proceedings. The most difficult issue was whether the union's failure to challenge the clinic's method of collecting and sealing the specimen, a method that was not in compliance with the procedures outlined in the collective bargaining agreement, amounted to breach of the duty of fair representation. Under existing case law from the Northern District of Ohio, a defect in the mandated chain of custody arguably could serve as a basis to set aside a discharge resulting from a drug test violation. *See id.* at 1329. Accordingly, we had to consider whether the union's failure "to raise this issue in a timely fashion may have constituted more than mere negligence, and whether not raising the chain of custody issue may have been far outside a wide range of reasonableness because it may well have made a difference in the outcome of [the plaintiff's] grievance." *Id.* (internal quotation marks omitted). Although recognizing that the issue was a close call, we held that the error did not rise to the level of breach. Specifically, we found that

> The chain of custody issue is the most difficult of those raised by Walk. Failure to challenge the procedure did not involve a mere tactical decision by Local 299, and it did not involve a large expenditure of funds. It presents a very close question, but we are persuaded that this failure was more of an omission or oversight, a negligent

> error of judgment that was not directed against plaintiff capriciously or in bad faith. We accordingly conclude, despite some reservation, that this conduct was not outside the *O'Neill* standard under all the circumstances.

*Id.* Thus, *Walk* presented a much more difficult question than the case at bar because unlike the situation here, in *Walk*, the union's decision not to research and present a particular defense was not even the product of a tactical decision. Here, Neal's decision not to prepare a response to the applicability of the thirty-day rule was a tactical decision subject to deference. Accordingly, there was insufficient evidence to support a finding of arbitrary conduct on this issue.

Last, Garrison maintains that it was arbitrary behavior for Neal to sit silent during the NJSSC hearing and not challenge the arguments made by Cassens in support of the applicability of the thirty-day rule. Again, although Neal's muteness was not the most effective method to assist Garrison in his grievance, it was not so unreasonable to constitute sufficient evidence of breach of the duty of fair representation; at worst, it was negligence. *See Black*, 15 F.3d at 584 ("As the Supreme Court has made abundantly clear, a plaintiff will not succeed if he can show only slightly unreasonable behavior on the part of the union . . . ."). The fact of the matter is that Garrison assumed primary responsibility for presenting his grievance before the NJSSC. In his capacity as chief presenter, he responded to and challenged Cassens's assertion that the thirty-day rule should defeat his claim. Before the committee, Garrison specifically argued that "I did not believe the thirty (30)-day report rule . . . is applicable, because you will find [that] in NMATA . . . seniority shall not be broken except by discharge, voluntary quit, [or more than a seven (7)-year layoff]." Given that Neal had made the reasoned judgment not to research or prepare for what he believed was an inapplicable rule, we cannot see--and Garrison has not explained--what more Neal could have said or done before the committee other than repeat Garrison's interpretation of NMATA. Although Garrison is correct to

assert that Neal would likely have more credibility than Garrison, any intervention by Neal would not have added much, if any, value to what was already argued by Garrison. Also, regardless of the arguments made at the hearing, the NJSSC panel was supplied copies of the prior arbitration decisions, and itself was able to assess the relevance of those decisions.

Without sufficient evidence that Local 327 breached its duty of fair representation, Garrison's hybrid § 301 action must fail. Accordingly, we need not address Cassens's alleged breach of the collective bargaining agreement, or the numerous other issues that Cassens has raised on appeal. Because we reverse the denial of Cassens's motion for judgment as a matter of law, we consider whether any grounds exist that might warrant a new trial. *See Neely v. Martin K. Eby Constr. Co.*, 386 U.S. 317, 328-29 (1967). Garrison did not request a new trial in his brief in the event we reversed the district court and has presented no reasons why a new trial should be ordered. Our review of record also convinces us that no such grounds exist. Therefore, we direct the entry of judgment as a matter of law for Cassens. *See id.* at 326 (holding that an appellate court may in its discretion appropriately instruct the district court to enter judgment against a jury-verdict winner when further proceedings are unwarranted). Accordingly, the judgment below is REVERSED, and this case is REMANDED to the district court for the entry of judgment as a matter of law for Cassens.

**C.  *Civil Contempt Order***

On January 7, 2002, the district court entered an order holding Cassens in civil contempt of the court's prior order of July 24, 2001. Specifically, it found that Cassens failed to timely reinstate Garrison to his job and to his rightful place on the Cassens seniority list and failed to make certain pension payments as ordered by the court. Because Garrison had already been reinstated by Cassens at the time the court issued its ruling, as compensatory damages for contempt, Cassens

was ordered to pay lost wages to Garrison in the amount of $15, 367.75, and to assign Garrison a company seniority date of June 10, 1996, on its roster and all records. Cassens was also ordered to pay Garrison retroactive pension contributions beginning from June 10, 1996. Because we find no basis for liability under § 301, we necessarily reverse and vacate the district court's civil contempt order in its entirety.

"Broadly, the purpose of civil contempt is to coerce an individual to perform an act or to compensate an injured complainant." *United States v. Bayshore Assocs., Inc.*, 934 F.2d 1391, 1400 (6th Cir. 1991). The purpose of a criminal contempt order, however, is "punitive"; it is "to vindicate the authority of the court." *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911). "The general rule is that whether a contempt judgment survives the avoidance of an underlying order depends on the nature of the contempt decree. If the contempt is criminal it stands; if it is civil it falls." *Latrobe Steel Co. v. United Steelworkers*, 545 F.2d 1336, 1342 (3d Cir. 1976) (citation omitted).

As the Supreme Court has long held

> It does not follow, of course, that simply because a defendant may be punished for criminal contempt for disobedience of an order later set aside on appeal, that the plaintiff in the action may profit by way of a fine imposed in a simultaneous proceeding for civil contempt based upon a violation of the same order. *The right to remedial relief falls with an injunction which events prove was erroneously issued* . . . .

*United States v. United Mine Workers*, 330 U.S. 258, 294-95 (1947) (emphasis added). In a similar vein, we have also explained that

> A conviction for criminal contempt may indeed survive the reversal of the decree disobeyed; the punishment is to vindicate the court's authority which has been equally flouted whether or not the command was right. But the

same cannot be true of civil contempts, which are only remedial. It is true that the reversal of the decree does not retroactively obliterate the past existence of the violation; yet on the other hand it does more than destroy the future sanction of the decree. It adjudges that it never should have passed; that the right which it affected to create was no right at all. To let the liability stand for past contumacy would be to give the plaintiff a remedy not for a right but for a wrong which the law should not do.

*Blaylock v. Checker Oil Co.*, 547 F.2d 962, 966 (6th Cir. 1976) (quoting *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.*, 86 F.2d 727, 727 (2d Cir. 1936) (per curiam)).

In the instant matter, in imposing sanctions, the district court focused exclusively on compensating Garrison for the losses he sustained as a result of Cassens's alleged contempt. The court's narrow focus leaves no doubt that the contempt order at issue is remedial in nature. *See Latrobe Steel Co.*, 545 F.2d at 1344 ("Remedial or compensatory actions are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of disobedience.") (citations omitted). That being so, and having already determined that there is no basis for liability in the underlying action, then pursuant to controlling authority, the district court's compensatory contempt order can no longer stand.

### III. CONCLUSION

We **REVERSE** the jury verdict and **REMAND** to the district court for the entry of judgment as a matter of law for Cassens in case No. 01-6056. In case No. 02-5124, we **REVERSE** and **VACATE** the district court's contempt order in its entirety.