NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0220n.06
Filed: March 27, 2007

No. 06-3223

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GREGORY V. PATTON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| THE BUDD COMPANY; | ) | NORTHERN DISTRICT OF OHIO |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE & | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA; | ) | |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE & | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, LOCAL 1803 | ) | |
| | | |
| Defendants-Appellees. | | |

Before: SILER, GIBBONS, and ROGERS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** This case arises out of a hybrid action brought under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Following arbitration, plaintiff-appellant, Gregory Patton, challenged in federal district court his termination by his former employer, The Budd Company, and the quality of representation provided by his union representatives. The district court granted summary judgment to Patton's employer and his union, determining that Patton failed to present evidence creating a triable issue of fact as to his claim.

1

For the reasons below, we affirm the judgment of the district court.

**I.**

In 1985, plaintiff-appellant, Gregory Patton, began his employment in the Carey, Ohio, plant of defendant-appellee, The Budd Company ("Budd"), a Michigan corporation, which manufactures fiberglass automotive components. While employed with Budd, Patton was a member of defendants-appellees, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW ("the UAW") and Local 1803 of the International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America ("the Local") (collectively "the Union"). The Local served as the exclusive bargaining agent for all production and maintenance employees at the Carey plant. A collective bargaining agreement ("the CBA") between Budd and the Union governed Patton's relationship with Budd.

In 2000, Budd instituted a lean manufacturing training program, referred to as "Lego training," utilized to identify and eliminate waste or inefficiency in the manufacturing process. Each Budd employee was expected to attend an eight-hour training session. Patton objected to the institution of the Lego program from the outset, deeming it "an insult or a slap in the face." Patton cited various grounds for his concerns. He feared that the program would lead to the elimination of jobs and disapproved of the introduction of training methods utilized by Japanese carmarkers. He believed that Lego training would teach him "[a]bsolutely nothing" and that he would be "embarassed" and "harassed," forced to wear a name tag, and "singled out in a group of twenty instead of the whole shop going at once."

Patton spoke to numerous individuals regarding his concerns. When he approached Rick Charville, the Carey plant manager, Charville informed him that he had a corporate order permitting

2

Budd to require Lego training. According to Patton, Charville threatened to fire him if he voiced his concerns about the Lego program on the factory floor. Patton expressed similar reservations in a subsequent conversation with Kurt Fink, the Budd employee responsible for Lego training. When Fink offered to provide Patton with a private training session, Patton declined and called Fink a "communist." David Camper, the then-president of the Local, informed Patton that all employees were required to attend Lego training and that Patton should comply.

Unsatisfied, Patton traveled, on August 16, 2001, to Budd's North Baltimore plant to speak with Larry Baer, the North Baltimore plant manager. Patton claims that he consulted with Baer in the hope that Baer would intervene in his increasingly acrimonious relationship with Camper. According to Patton, when he attempted to discuss his concerns about the Lego program with Camper, Camper called him a "gutless, ball-less coward that couldn't attend an eight-hour brainwash." Patton warned Baer that "violence [was] going to erupt" at the Carey plant and asked whether it was necessary for him to carry a gun in the shop to work there. Baer assured Patton that he was going to speak with someone regarding the situation. He subsequently emailed Charville and notified him of the situation, explaining that Patton had complained about the Lego training and claimed that Camper had threatened him with physical harm. Baer's email also informed Charville that Patton had stated that he had no plans to take a gun to work, "but if he wanted to he had plenty of guns at home."

The events of August 17, 2001, are undisputed. Dave Newcomer, the foreman on Patton's shift, approached Patton and informed him that he was wanted in the office for a meeting. Patton requested a union steward. Audie McDonald, the appointed steward, arrived shortly thereafter. When Newcomer informed McDonald that the meeting was not disciplinary in nature but refused

3

to explain the purpose of the meeting, McDonald responded that Patton was not required to attend the meeting. Charville and Terry Hussey, the division personnel manager, soon joined the group. Hussey explained to Patton that he had the authority to order him to attend the meeting and to terminate Patton's employment if he declined to comply. Patton testified that he repeatedly refused to comply: "I'm pointblank. I must have told twenty people twenty times, I'm not going in. No is no. I'm not going in. No is no. I'm not going in the office." He remained unrelenting, refusing a "direct order" from Charville to attend the meeting and the advice of Camper, who was called to the floor and encouraged Patton to comply with management's request.

Because Patton refused to comply with several direct orders to attend the meeting, management suspended him indefinitely. On August 23, 2000, Patton received a letter from Budd, dated August 22, 2000, recounting the events of August 17 and notifying him that Budd considered his behavior insubordinate and was, therefore, terminating his employment. The letter directed Patton not to enter Budd property "unless specifically directed by Management." Patton does not deny that he failed to attend a September 12, 2000, termination hearing subsequent to his suspension.

Following Patton's termination, both Camper and Patton filed what Patton concedes are virtually identical grievances with the Union; Camper filed Grievance 99-00, and Patton filed Grievance 92-00. Because Grievance 92-00 was filed after the applicable two-day deadline, management did not consider it.[1] After the Local initially declined to pursue Grievance 99-00,[2]

---

[1]Patton did not appeal the dismissal of Grievance 92-00.

[2] Kenneth Lortz, the representative for the UAW, testified that the Union decided not to pursue Grievance 99-00 because the Union believed it to be a meritless grievance in light of Patton's indication to Lortz that he did not want his job back and Patton's decision to go against the advice

4

Patton successfully appealed to the UAW's Convention Appeals Commission, which ordered Kenneth Lortz, the representative for the UAW, to reinstate Patton's grievance. The parties proceeded to arbitration pursuant to Article VI, Section 7 of the CBA.

In a letter dated October 14, 2002, Lortz notified Patton of an October 28, 2002, meeting scheduled to prepare for Patton's November 5 arbitration. By his own admission, Patton remained at the meeting for, at most, 45 minutes of the scheduled eight hours and, while there, "[s]creamed, yelled, cussed, [and] did everything." A letter from Norman Risner alerted Patton to a second preparatory meeting scheduled for November 4, 2002, the day prior to the arbitration. Patton failed to attend the November 4 meeting, though he sent his wife and nephew. Patton did not appear at the November 5 arbitration proceeding. Although he now attributes his absence to a burglary at his home and criticizes the Union's decision to proceed without him, he testified during his deposition that he never had any intention of attending the arbitration and told the Union not to arbitrate the case.

Following the hearing, the arbitrator issued a written opinion addressing whether Patton's insubordination constituted "just cause" for termination of Patton's employment. The arbitrator began by defining insubordination as an employee's "knowing, willful, and deliberate" act of disobedience in response to a "reasonable and work related" order both "explicitly and clearly given" by an individual with "appropriate authority" who provided the employee with sufficient warning of the consequences of his infraction and provided an opportunity for the employee to correct his behavior. The arbitrator found, evaluating the events of August 17 in light of Patton's general

of his union representatives to comply with management's order to attend the August 17 meeting.

5

intransigence in response to the Lego training, that Patton's actions constituted an "extremely serious" offense, challenging the "essence of the Company's production system." The arbitrator further determined that Patton's failure to appear at the arbitration hearing precluded him from "objecting to the implications logically drawn from the probative evidence at the hearing which leaves the case unrefuted." Patton's insubordination, the arbitrator concluded, constituted "just cause" for his termination. The arbitrator denied Patton's grievance on that ground.

On June 12, 2003, Patton filed the instant action in the United States District Court for the Northern District of Ohio. Patton brought his claim under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, alleging breach of the collective bargaining agreement by Budd and breach of the duty of fair representation by the Union. Appellees moved for summary judgment. The district court referred the appellees' motion to a United States Magistrate Judge who issued a report and recommendation advising the court to grant appellees' motion on the ground that Patton had failed to raise a genuine issue of material fact as to the two prongs of a successful hybrid § 301 claim. The district court adopted the report and recommendation in its entirety, concluding that the arbitrator did not err in finding that Budd did not breach the collective bargaining agreement. The court entered judgment for appellees on January 11, 2006. Patton filed a timely notice of appeal on February 6, 2006.

## II.

The panel reviews a district court's grant of summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999).[3] Summary judgment is proper "if the pleadings, depositions,

---

[3]Although the parties seem to agree that the *de novo* review standard is applicable in this case, their briefs strongly suggest that the arbitrator's decision is the object of our review and refer to the standards applicable to requests for the setting aside of an arbitration award. (*See, e.g.*, Brief

answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The panel must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**III.**

A plaintiff asserting a hybrid § 301 action brings two claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union. *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003). In order to recover against either party, a plaintiff must successfully demonstrate breach by both his employer and his union. *Id.* Because we conclude that Patton has failed to raise a genuine issue of material fact as to Budd's breach of the CBA, we do not address his claims relating to the Union's handling of his grievance.

"To determine if the CBA was breached, we look to the plain meaning of the agreement." *Roeder v. Am. Postal Workers Union, AFL-CIO*, 180 F.3d 733, 737 (6th Cir. 1999). Patton's brief

---

of The Budd Company, at 28 ("It has long been national policy to encourage the arbitration of labor disputes. Supporting this policy is the highly deferential standard of review courts apply when reviewing arbitration awards–a standard that has been described as one of the narrowest standards of judicial review in all American jurisprudence."). For the purposes of clarity, we note that this court has consistently utilized traditional summary judgments standards in evaluating the propriety of a district court's actions in response to a motion for summary disposition on a hybrid § 301 claim. *See, e.g.*, *White v. Detroit Edison Co.*, 472 F.3d 420, 424-25 (6th Cir. 2006); *Garrish v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers*, 417 F.3d 590, 594 (6th Cir. 2005); *Higgins v. Int'l Union, Sec., Police, Fire Prof'ls of America (SPFPA)*, 398 F.3d 384, 387 (6th Cir. 2005). Because Patton has abandoned his request for vacatur or modification of the arbitrator's award on appeal, we need not resort to the standards applicable to such a claim. *See, e.g.*, *Mich. Family Res. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007) (articulating the standard for review of arbitration awards in the Sixth Circuit).

7

identifies four alleged breaches of the CBA: (A) Budd did not permit Patton to attend the Fourth Step meeting provided for under Article VI, Section 6 of the CBA; (B) Budd failed to provide him with a discharge hearing or any disciplinary warnings in violation of Article VI, Section 11 of the CBA; (C) Budd eliminated his seniority based upon a discharge without cause; and (D) Budd lacked the authority to require the training at issue.

**A.**

Patton claims that Budd refused him the opportunity to attend the Fourth Step meeting concerning his grievance as required under Article VI, Section 6 of the CBA. The portion of the CBA on which Patton relies reads:

> Section 6-Step. No. 4
> . . . .
>
> The parties agree that an [a]ffected employee may attend the applicable portion of a 4th Step meeting when facts are in dispute and it is agreed that such attendance is mutually beneficial to all concerned. The intent of this option is to clarify facts when needed and shall not hinder the investigation process.

Patton's suggestion to the contrary notwithstanding, Section 6 does not mandate the presence of a grievant at a Fourth Step meeting. Rather, the provision permits a grievant's attendance when two conditions are present: (1) the facts are in dispute and (2) there is agreement that the grievant's attendance would be mutually beneficial to the parties. Patton's brief does not identify any disputed factual issues that would have compelled his attendance at the Fourth Step meeting. Moreover, given Patton's general failure to cooperate throughout the grievance process, it is not clear that his attendance would have contributed to a clarification of the facts in his case.

**B.**

8

Patton raises two claims under Article VI, Section 11 of the CBA: (1) Budd refused him a discharge hearing as required under that provision and (2) Budd failed to provide him with a disciplinary warning before taking disciplinary action against him.

The CBA directs that "[a]n employee recommended for discharge shall be allowed a discharge hearing if so requested." Patton argues that Budd denied him this contractually required discharge hearing following his termination. Under Article VI, Section 11, the hearing obligation is triggered by the request of the terminated employee. There is no evidence in the record that Patton requested a discharge hearing following his termination, however. Patton's claim relating to the timing of the discharge hearing is similarly unavailing. Even in those cases where a discharge hearing is required, the CBA does not mandate that the hearing occur within a particular time frame. Finally, it is undisputed that Patton declined to attend the termination hearing scheduled on his behalf because he received only oral assurances that he would not be subject to arrest upon reentering Budd property.

Section 11 of Article VI also requires that the company shall issue all disciplinary warnings to employees within thirty days of the occurrence prompting the warning. The plain language of the provision does not appear to require the issuance of warnings prior to the taking of any disciplinary action as Patton suggests. Instead, it directs that, should Budd wish to issue such a warning to an employee covered by the CBA, it must do so within thirty days. Patton does not direct the court to any language in the contract requiring that in all cases an employee is entitled to a written disciplinary warning before being subject to discipline.

**C.**

9

Patton claims that he was discharged without cause and, thus, wrongfully robbed of his seniority under Article IX, Section 2. Article IX reads:

Section 1

Seniority shall mean an employee's length of continuous service with the Company from his date of hire as determined upon the completion of the probationary period, providing that an employee has not lost his seniority in accordance with the terms set forth below.

Section 2

An employee shall lose his seniority for the following reasons:
. . . .

B. When an employee is discharged for cause and such discharge has not been reversed in the grievance procedure.

Much of Patton's argument proceeds on the assumption that Budd ended his employment because he refused to participate in the Lego training program and is unresponsive to appellees' argument that the true reason for his termination was his insubordination. There is no evidentiary support for Patton's characterization of Budd's decision. As to the sole explanation for Budd's action – Patton's refusal to comply with a request by management that he attend a meeting to discuss certain workplace issues – Patton does not dispute the underlying facts or offer any argument that Budd's termination decision was unjustified. As the arbitrator pointed out, management at the Carey plant had a legitimate basis for desiring a meeting with Patton given his unusually strong objections to the Lego training program, somewhat erratic behavior, and discussion with Baer concerning the imminent outbreak of violence at the plant.

Patton contends that the arbitrator's finding that he failed to comply with the general concept of "obey now, grieve later" "is not a matter of the applicable collective bargaining agreement," and

10

thus, his refusal to attend the meeting was justified. This is incorrect. Article VI, Section 16 of the CBA expressly codifies the "obey now, grieve later" principle, stating,

> It is mutually understood that in instances where an employee is convinced that a management action or instruction is improper under the terms and provisions of this agreement, the proper and required behavior on the part of an employee is to perform the direct action first and avail himself of the grievance procedure at a later time. Management agrees that it will not take disciplinary action in such a situation until the Union Steward has had the opportunity to counsel an employee concerning this contractual obligation.

Given the CBA's clear terms, Patton's submission that he was "free to disobey and take a chance that the underlying order will be found lacking in foundation in the grievance process" is directly contrary to the terms of the contract governing his employment relationship with Budd. Moreover, Patton does not contest appellees' claim that his union representatives encouraged him to comply with the directives from management and made him aware of the consequences of failure to comply.

### D.

Patton claims that Budd, by requiring the completion of Lego training by all employees, violated the terms of the CBA. Article VIII of the CBA provides:

> Except as explicitly limited by a specific provision or provisions of this agreement, the Union recognizes that the Company retains the exclusive right to manage its business, including (but not limited to) the right to determine the methods and means by which its operations are to be carried on, to determine the products to be manufactured, and the work to be performed in the plant, to direct the work force and to conduct its operations in a safe and effective manner.

The language of the CBA empowers Budd to make substantive decisions regarding the conduct of its employees in carrying out its business. The imposition of training aimed at improving the manufacturing process, for which employees would be paid a regular wage, falls within the purview

11

of Budd's authority under the CBA. Thus, Patton's claim that Budd's decision to require Lego training violated its agreement with the Union and its members is without merit.

We conclude that Patton has failed to raise a genuine issue of material fact as to Budd's breach of the CBA. This conclusion is dispositive of Patton's hybrid § 301 claim. *See Garrish v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers*, 417 F.3d 590, 594 (6th Cir. 2005) (observing that if plaintiff fails to satisfy both prongs of § 301 action, he cannot succeed against any defendant); *Roeder*, 180 F.3d at 738 (noting that plaintiff's failure in hybrid § 301 action to demonstrate breach of collective bargaining agreement by employer "serves as an independent [ground] upon which to affirm the district court"); *Adcox v. Teledyne, Inc.*, 21 F.3d 1381, 1386 (6th Cir. 1994) ("[T]here was no breach of a collective bargaining agreement here, and therefore plaintiffs' hybrid § 301 claim must fail."). Therefore, we need not and do not consider Patton's claims regarding the adequacy of the representation provided by the Union.

**III.**

For the foregoing reasons, we affirm the judgment of the district court in favor of defendants-appellees.