NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0458n.06

No. 08-1313

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jul 01, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DEBORAH LYNNE DANTON, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| BRIGHTON HOSPITAL; INTERNATIONAL | ) | **O P I N I O N** |
| BROTHERHOOD OF TEAMSTERS, | ) | |
| LOCAL 337, | ) | |
| | ) | |
| *Defendants-Appellees.* | | |

BEFORE:   COLE and ROGERS, Circuit Judges; GRAHAM, District Judge[*]

       **COLE, Circuit Judge.**  Plaintiff-Appellant Deborah Lynne Danton appeals the district

court's February 5, 2008 order granting summary judgment to Defendants-Appellees Brighton

Hospital ("Brighton") and International Brotherhood of Teamsters, Local 337 ("Union" or

"Teamsters Local 337") (collectively, "Defendants").  Danton sued Defendants under § 301 of the

Labor Relations Management Act, 29 U.S.C. §§ 141 ("§ 301" or "hybrid § 301"), et seq., claiming

that the Union breached its duty of fair representation in her claim of wrongful termination against

her former employer, Brighton, and that her termination violated the terms of Brighton's collective

bargaining agreement with the Union.  For the following reasons, we **AFFIRM** the district court's

decision.

_____

       [*]The Honorable James L. Graham, United States District Judge for the Southern District
of Ohio, sitting by designation.

# I.  BACKGROUND

Brighton is a non-profit healthcare corporation located in Brighton, Michigan.  The facility provides treatment for individuals with substance abuse problems, including alcohol and drug rehabilitation.  Patients served by Brighton often enter the facility at a time of urgent need and many also suffer from mental health issues.

Teamsters Local 337 provides union representation for employees working at Brighton.  The Union and Brighton are parties to a collective bargaining agreement ("CBA").  The CBA relevant to this case was effective December 11, 2004 through December 11, 2007.  The CBA as well as Brighton's policies and procedures govern the employment relationship between Brighton and its employees.

## A.    The CBA

Article XIII of the CBA provides, in relevant part:

Section A.  [Brighton] shall not discharge or suspend any seniority employee without just cause but, in respect to discharge or suspension, shall give at least one (1) warning notice of the complaint against such employee to the employee, in writing, and a copy of same to the Union and steward affected, except that no warning notice need be given to an employee before she is discharged if the cause of such discharge is . . . violation of work rules agreed upon, in writing, which permit summary discharge for the offense.  The warning notice herein provided shall not remain in effect for a period of more than twelve (12) months from the date of said warning notice.  Discharge or suspension must be by written notice of the action and the specific grounds therefor to the employee, her steward and the Union within ten (10) days from the date that the Hospital knew of the offense.

Section B.  Grievances protesting discharge or suspension shall be filed within ten (10) working days from receipt of the written notice and shall be processed in accordance with the grievance and arbitration procedure.

(CBA 30-31, Record On Appeal ("ROA") 48-49.)  Article XIX of the CBA states, in part:

Level III Offenses

The penalty for the following offenses is a one (1) week suspension, without pay, for the first offense and subject to termination for the second offense:

. . .

5.      Neglect of a patient.

(CBA 35, ROA 53.)

**B.      Danton's employment and termination**

In May 2004, Brighton hired Danton, a certified social worker, to serve as a Master's Level Therapist. At the time of her termination, Danton was employed in Brighton's partial hospitalization rehabilitation program ("PHP"). There, her duties included meeting with, interviewing, and treating patients, conducting group therapy sessions, attending team meetings, communicating with family members, and completing necessary paperwork related to individual patients.

On October 19, 2005, Danton was suspended for one week for her first Level III offense— neglect of a patient. Defendants aver that the grounds of that offense were that Danton did not satisfactorily meet with and treat a patient, went for long periods without contacting that patient, and did not include the patient's family in treatment and counseling sessions. Danton disagreed with the grounds for the suspension and filed a grievance; however the suspension was upheld in the grievance process. The validity of Danton's first Level III offense is not at issue in this appeal.

On September 14, 2006, Brighton notified Danton that it was terminating her for a second Level III offense of patient neglect. Brighton cites two separate issues as justification for Danton's termination. First, Brighton states that on September 5 and 6, 2006 a patient was admitted to PHP

and assigned to Danton, but Danton failed to make contact with the patient or alert her supervisor of the necessary follow-up for that patient, who allegedly was in a great deal of distress. Second, Brighton states that Danton arrived late to work on September 13, 2006, leaving a patient waiting until 9:50 a.m. to begin a procedure allegedly scheduled for 9:00 a.m.

While the parties disagree about some of the circumstances leading to Danton's termination, the following facts are undisputed. The first incident stems from events beginning on September 5, 2006, when a patient was admitted to Brighton and assigned to Danton for an initial treatment session ("first session"). The first session is an important primary step in the rehabilitation process and includes evaluating the patient, developing the patient's treatment plan, signing releases, and, among other things, completing required paperwork. The first session typically lasts an hour and a half to two hours. Brighton requires the first session to be completed within twenty-four hours of the patient's admittance.

On September 6, 2006, Danton met the patient to conduct the first session, but had to end the session early due to a family emergency. Danton's notes indicate that she met with the patient from 11:55 a.m. until 12:15 p.m., although Brighton's records show that Danton clocked out of work at 12:13 p.m. In concluding her meeting with the patient, Danton told the patient that she would finish the first session the following day.

Leaving Brighton that day, Danton called her supervisor, Jennifer Mitchell, on Mitchell's office phone, and left a message stating only that she was leaving early for the day on an emergency basis. Danton did not inform Mitchell that she had failed to complete her first session with the patient and did not provide any further treatment information. Brighton contends that Mitchell had

previously informed Danton of the policy that Danton was required to contact Mitchell on her cellular phone if the need arose to miss work or leave early. Danton asserts there was no official written policy that she needed to contact her supervisor on her cellular phone. In any event, Danton does not contend that she made further efforts to reach Mitchell or that she tried to contact any other individuals in PHP regarding the patient.

In the meantime, the patient at issue contacted another therapist, Sandra Jergens, relating that he was in distress and that Danton had not completed his first session. Jergens conducted a full first session with the patient and completed all the required documentation.

The following day, Danton did not come into work. Instead, she left another message on Mitchell's office phone, stating that she would not be at work. Once again, Danton did not mention her unfinished first session with the patient.

The second incident relates to Danton's late arrival to work on September 13, 2006. Danton was scheduled to begin work at 9:00 a.m., at which time she was scheduled to perform acupuncture treatment. That morning, Danton was running late; however, she did not contact PHP or her supervisor to report that she was behind schedule. Mitchell attempted to contact Danton, but Danton did not answer her cellular phone. Danton arrived at Brighton at 9:33 a.m. and did not begin the acupuncture session until 9:50 a.m.

## C.    The grievance process

On September 20, 2006, Danton filed a grievance responding to the allegations in Brighton's September 14, 2006 Corrective Action Report, arguing that her termination violated the CBA. Danton's Grievance Report states, in relevant part:

> . . . I was in a personal crisis during this time, & I was in the middle of applying for FMLA due to my mother's multiple medical concerns. That I could not remember [Mitchell's] cell phone number the morning of 9/7 indicates the level of my own distress. I was not thinking clearly, & was not focused on what the patients at Brighton Hosp. may have needed. If info was needed about a patient, I have no doubt that I would have been contacted via phone by a hospital employee, as I have in the past. The statement that I am guilty of neglect of a patient is not true.

(Danton Grievance Report, ROA 197.) Danton argued that her termination was improper because neither of the two alleged offenses constituted neglect of a patient.

Danton took part in her first-step grievance meeting, an informal meeting occurring at Brighton's facilities on October 5, 2006. Danton was accompanied by her Union steward, Catherine East, Union business agent, Reno Mifsud, and a Brighton representative, Marissa Delisle. The parties met to try to reach an agreement regarding Danton's termination. Delisle presented Brighton's findings against Danton, and Danton had an opportunity to present her side of the case. As Danton's Union representative, Mifsud asked Delisle if Danton could be reinstated. When Delisle said she could not reinstate Danton, Mifsud informed Danton that she could continue the grievance process by proceeding to a panel hearing. Danton elected to continue her grievance to the panel hearing.

On November 14, 2006, Danton's panel hearing was held at the Union's Detroit offices. The purpose of the meeting was to determine whether the Union would demand arbitration regarding Danton's grievance. Patrick Dougherty and Marc Villasurda, the panel co-chairs, presided over the hearing and were responsible for making a recommendation to the Union's Executive Board regarding arbitration. At the hearing, Brighton presented evidence to support its decision to terminate Danton. Danton spoke on her own behalf. Danton's Union representative, East, did not

attend the meeting because she became lost en route, and the Union did not present additional evidence at the hearing. At the conclusion of the hearing, the panel told Danton that it would inform her of the Union's decision on arbitration in about thirty days. Ultimately, the panel recommended, and the Union Executive Board agreed, that Danton's grievance should not be arbitrated.

**D.      Procedural history**

Danton brought this action in the United States District Court for the Eastern District of Michigan on March 13, 2007, alleging wrongful discharge by Brighton and breach of the duty of fair representation by the Union. Following discovery, both Brighton and the Union filed motions for summary judgment. The court granted both parties' motions, finding that Danton had provided insufficient evidence to establish that the Union had breached its duty of fair representation. *Danton v. Brighton Hosp.*, 533 F. Supp. 2d 724, 729-30 (E.D. Mich. 2008). This appeal followed.

## II.  ANALYSIS

**A.      Standard of Review**

This Court reviews a grant of summary judgment de novo. *Sullivan v. Or. Ford, Inc.*, 559 F.3d 594, 594 (6th Cir. 2009). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "We view factual evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Jones v. Blige*, 558 F.3d 485, 490 (6th Cir. 2009) (citing *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006)). However, "[a] mere scintilla of evidence is insufficient;

there must be evidence on which the jury could reasonably find for the [non-movant]." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**B.      Section 301 claims**

When a union member files claims alleging breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union, the action is known as a hybrid § 301 action. *See Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir. 1994). The Supreme Court has stated:

> [s]uch a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on § 301, since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. Yet the two claims are inextricably interdependent. To prevail against either the company or the Union, . . . [plaintiffs] must show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union.

*Delcostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983) (internal citations and quotations omitted). Thus, a plaintiff must show both a breach of the collective bargaining agreement and a breach of the duty of fair representation. "Unless a plaintiff demonstrates both violations, he cannot succeed against either party." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003).

"Just as . . . fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 75 (1991) (citations omitted). "In order to prove

a breach of the duty of fair representation, an employee must demonstrate that the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith." *Garrison*, 334 F.3d at 538 (citing *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)).

If an employee demonstrates that the union acted contrary to its legal duty, "the employee must then show that the union's actions or omissions 'tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach.'" *Garrison*, 334 F.3d at 539 (quoting *Dushaw v. Roadway Express, Inc.*, 66 F.3d 129, 132 (6th Cir. 1995)). The impact of the union's breach must be substantial such that the plaintiff "must meet the onerous burden of proving that the grievance process was 'seriously flawed by the union's breach.'" *Black*, 15 F.3d at 585 (quoting *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570 (1976)).

*1.      The Union did not breach its duty of fair representation*

For Danton to succeed on her breach of the duty of fair representation claim, she must provide evidence that the Union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith. Each of these wrongs is mutually independent, meaning that "the three named factors are three separate and distinct possible routes by which a union may be found to have breached its duty." *Black*, 15 F.3d at 584. Specifically, Danton argues that a reasonable jury could find that the Union's inaction was arbitrary because it failed to investigate fully the incidents in the September 14, 2006 Corrective Action Report, and it failed to represent her adequately during the grievance hearings. "With regard to the arbitrary prong, 'a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational.'" *Garrison*, 334 F.3d at 538

- 9 -

(quoting *O'Neill*, 499 U.S. at 67). "Mere negligence on the part of a union does not satisfy this requirement." *Id*. (citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372-73, 376 (1990)). "In essence then, to prevail, a plaintiff has the difficult task of showing that the union's actions were 'wholly irrational.'" *Id*. at 538-39 (quoting *O'Neill*, 499 U.S. at 78).

Given the facts of this case, Danton has not met her burden of demonstrating that the Union's actions were wholly irrational. After Danton received her second Corrective Action Report, which served as her termination notice, East investigated Brighton's claims. East met with Danton to hear her version of the events and sought documentation of the alleged incidents, including notes relating to Danton's September 5, 2006 patient session. East and Mifsud attended Danton's first-step grievance meeting. Further, Mifsud attended, and East attempted to attend, Danton's panel hearing in Detroit. Finally, while the Union decided not to go forward to arbitration, Union officials reached their decision only after allowing Danton to make her case at the panel hearing. We find nothing irrational in the Union's reasoning that Danton's appeal should not continue because she had been entrusted with a position of substantial responsibility—treating patients with substance-abuse issues at a time of great need—yet she had not focused on patient needs, had not followed proper procedures, and had not communicated adequately her patient's needs to her supervisor or other professionals at PHP.

Danton argues that the Union should have done more to represent her. She argues that the Union should have further investigated her defenses, should have filed a brief at the panel hearing, and should have used her family emergency as a defense at her hearings. But Danton holds Union representatives to too high a standard, and fails to explain how any change in the Union's tactics

would have affected the outcome of the proceedings. First, as to the standard required for fair representation, this Court must temper its judgment of the Union's actions by recalling that union agents are not lawyers. *See Garrison*, 334 F.3d at 539. As the district court noted, mere negligence or poor judgment would not give rise to a claim for breach of the duty of fair representation. *Danton*, 533 F. Supp. 2d at 729 (citing *United Steelworkers of Am. v. Rawson*, 496 U.S. 362, 372-73 (1990)). Though, arguably, the Union could have done more to represent Danton, there is no evidence that the Union was wholly irrational in its representation. In fact, it appears that the Union found that the biggest obstacle to Danton's effective defense was that she contested so few of the facts alleged by Brighton.

Second, even assuming that Danton demonstrated that the Union acted contrary to its legal duty, she must also show that the Union's failures "tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach." *Dushaw*, 66 F.3d at 132. None of Danton's arguments meets this standard. Simply put, Danton fails to put forth sufficient evidence that the Union's action or alleged inaction tainted the grievance process. For all these reasons, we conclude that summary judgment was appropriate for Danton's breach of the duty of fair representation claim.

### 2. *No need to reach the alleged breach of the CBA*

Because we conclude that the Union did not breach its duty of fair representation, there is no need to address Danton's breach of the CBA claim. To establish a hybrid § 301 claim, a plaintiff must show both a breach of the duty of fair representation by the union and a breach of contract by the employer. *Summers v. Keebler Co.*, 133 F. App'x 249, 251 (6th Cir. 2005) (citing *DelCostello*,

- 11 -

462 U.S. at 164-65). These "two claims are inextricably interdependent." *DelCostello*, 462 U.S. at 164. Because Danton cannot show a breach of the duty of fair representation, she "cannot succeed against either party." *Garrison*, 334 F.3d at 538

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment for Defendants.