Jason BLESEDELL, Plaintiff–
Appellant,

v.

CHILLICOTHE TELEPHONE COM-
PANY, c/o Jack E. Thompson, Statu-
tory Agent, International Brotherhood
of Electrical Workers Local 578; Eric
W. Stevens, Defendants–Appellees.

No. 15–3542.

United States Court of Appeals,
Sixth Circuit.

Argued: Dec. 4, 2015.

Decided and Filed: Jan. 22, 2016.

**ARGUED:** Mark S. Coco, Harris, McClellan, Binau & Cox, P.L.L., Columbus, Ohio, for Appellant. D. Lewis Clark, Jr., Squire Patton Boggs (US) LLP, Phoenix, Arizona, for Appellees Chillicothe Telephone and Stevens. Ryan Keith Hymore, Mangano Law Offices Co., L.P.A., Cincinnati, Ohio, for Appellee International Brotherhood. **ON BRIEF:** Mark S. Coco, Harris, McClellan, Binau & Cox, P.L.L., Columbus, Ohio, for Appellant. D. Lewis Clark, Jr., W. Michael Hanna, Squire Patton Boggs (US) LLP, Phoenix, Arizona, for Appellees Chillicothe Telephone and Stevens. Ryan Keith Hymore, Mangano Law Offices Co., L.P.A., Cincinnati, Ohio, for Appellee International Brotherhood.

Before: SILER, GIBBONS, and ROGERS, Circuit Judges.

## OPINION

ROGERS, Circuit Judge.

Jason Blesedell, who was formerly employed by Chillicothe Telephone Company, was terminated for falsifying a timecard and impersonating a customer in telephone calls to the company. Blesedell sued the company and his union, asserting a hybrid § 301/fair-representation claim. Blesedell also asserted a defamation claim against the company's human resources manager, taking issue with the manager's statements to union members and a police offi-cer. Because the union did not breach its duty of fair representation during the grievance process, both the union and the company were properly granted summary judgment on the hybrid claim. Summary judgment was likewise proper on the defamation claim because the statements at issue were true or were protected by a qualified privilege.

Blesedell worked for Chillicothe Telephone Company (CTC) from 1996 until his termination on December 17, 2012, most recently as a plant facilities technician. At all relevant times, Blesedell was a member of the International Brotherhood of Electrical Workers, Local 578 (the Union). As a plant facilities technician, Blesedell performed repair and installation work on telephone cables and other equipment. Blesedell reported to a building every morning, "the Exchange," to receive "trouble tickets," which reflected the work that he was assigned to perform. Trouble tickets were created when a customer called the service center to report an outage or other problem. Each ticket had a corresponding ticket number. After completing the work reflected by the trouble ticket, Blesedell would call CTC's service center to tell a dispatcher that the ticket had been cleared. CTC records many of the calls to the service center from technicians, customers, and other callers.

This case arose from events in December 2012 and January 2013. On Monday, December 3, Blesedell and his supervisor, Gerald Parker, were operating on different assumptions regarding whether Blesedell was scheduled to perform "fiber training" during that week. This confusion appeared to be resolved when Parker talked with Blesedell on the afternoon of December 3 or the morning of December 4, instructing Blesedell to continue working on trouble tickets. In the morning of December 4, Blesedell worked with technician

Mike Causey on aerial cable lines. The ticket was cleared by the dispatchers at 11:20 A.M. At 11:39 A.M., Blesedell called the service center and had the following conversation with dispatcher Linda Mitchell:

[Blesedell]: Did you have any locates or anything down here that you need me to check up on? I got ahold of Gerald [Parker]. He said he's going to get with-I'm in fiber training this week.

[Mitchell]: Yep.

. . . .

[Mitchell]: I think they sent Greg Bowdle down there to cover trouble. I don't see any locates.

[Blesedell]: Okay, just wanted to check. I'm going to eat and I'm just kind of waiting on his call. I'll just deal with it as we go. If you need anything though, call me. If I'm around here local, I'll take care of it.

At some point in the early afternoon of December 4, dispatcher Kim Barnes called Parker to ask whether Blesedell was supposed to be in fiber training. After Parker responded that Blesedell was doing trouble tickets instead of training, Barnes said that she gave all of Blesedell's tickets to another technician. From this conversation, Parker formed the impression that Blesedell was attempting to avoid tickets. In a telephone call with Parker at 3:27 P.M., Blesedell urged that he was not refusing tickets. Nothing in the record indicates that Parker asked Blesedell what work he had been doing.

The GPS units in CTC's vehicles monitor the location of the vehicles. The GPS on Blesedell's vehicle indicates that on the afternoon of December 4, Blesedell was parked at the Exchange between 1:38 and 3:22 P.M., left the Exchange at 3:22, returned at 3:37, and left again at 4:04 to return home. Blesedell's timecard, which Blesedell completed at some point before leaving, indicated that he had done four hours of work in the afternoon on buried cable maintenance.

After Parker's conversation with Barnes, Parker shared his concerns about Blesedell's work with CTC's Human Resources Manager Eric Stevens. Stevens listened to the recording of the conversation that morning between Blesedell and dispatcher Mitchell. Although Stevens did not believe that Blesedell was refusing to work on trouble tickets, Stevens questioned what work Blesedell had done on December 4. Stevens examined Blesedell's timecard and did not find any tickets in CTC's records corresponding to buried cable maintenance for the afternoon of December 4. Nor was there any buried cable work at the Exchange that an employee of Blesedell's work classification would handle. According to Stevens, "the number that was put on the timecard, and the GPS records, [and] what Mr. Parker was telling us, didn't coincide with each other."

Concerned that Blesedell may have falsified a timecard, CTC decided to conduct a fact-finding meeting on December 14. Before that meeting, Parker, Stevens, CTC's Talent Coordinator Debbie Coe, CTC's General Manager of Operations Trevor Kendall, Union President David Morgan, and Union Vice President Matt Ervin met without Blesedell. CTC expressed to Morgan and Ervin its concern with Blesedell's work on December 4, and may have gone so far as to state that it wanted to terminate Blesedell. After that discussion and before the fact-finding meeting, Morgan and Ervin briefly talked with Blesedell. Blesedell maintains that Morgan and Ervin told him nothing about the purpose of the meeting. CTC then conducted the fact-finding meeting with Blesedell, asking him about his whereabouts on the afternoon of December 4. Blesedell first stated that he was "possibly" doing work with

Mark Tanner, another technician. CTC then confirmed that Tanner was not with Blesedell on December 4. After a break in the meeting, Blesedell remembered that he had worked on a telephone pedestal that "had been hit several times" by cars. CTC concluded the meeting to investigate Blesedell's claim concerning the pedestal.

Immediately after the meeting, Blesedell called CTC's service center. Blesedell told dispatcher Barnes: "[W]e had a maintenance ticket, there was a car accident on Massieville Road.... Anyway, we cleared it last week. Can you see if you can find [it?]" Blesedell said that the accident damaged one of CTC's pedestals, which was located at walking distance from the Exchange on the property of Frank Robinson. Barnes located a trouble ticket for work on that pedestal. This ticket, however, was created on December 9 and was cleared by Blesedell on December 10. Blesedell advised Barnes that the work was in fact performed on December 4, and asked Barnes to write on the ticket that the pedestal had been damaged on December 4 and repaired that afternoon. Barnes complied. The modified ticket thus showed that it was created on December 9 and cleared on December 10, but a note added at the bottom of the ticket indicated that the pedestal was damaged and repaired on December 4.

Still in the afternoon of December 14, at some point after Blesedell's conversation with dispatcher Barnes, Stevens investigated the pedestal work that Blesedell claimed to have done. Stevens found the modified ticket and noticed the discrepancy between the date of creation—December 9—and the note at the bottom of the ticket. Stevens also reviewed the recordings of telephone calls related to that ticket. In a December 9 call between Blesedell and a dispatcher, Blesedell reported a crushed pedestal and said that he would repair it the next day. In a December 10 call, Blesedell reported that he had finished the work. The recordings and the information on the ticket led Stevens to believe that Blesedell had gone into the computer system to modify the ticket, in an attempt to manufacture evidence that he had done pedestal work on December 4.

Also in the afternoon of December 14, Blesedell called Stevens. Blesedell told Stevens that Blesedell had worked on the pedestal on December 4 even though a ticket had not been created until December 9. Blesedell explained that the pedestal had been hit on two different dates and "the records didn't reflect that." Stevens did not ask whether Blesedell modified the ticket at issue. During the call, Blesedell also described an incident that occurred after the fact-finding meeting and immediately before his call with Stevens. According to Blesedell, when he was driving home from the Exchange, he pulled into the parking lot of a Mega Surplus store so that he could return to the Exchange to check whether a door was shut. When Blesedell returned to the Exchange, one Dustin Riehle pulled up and started "screaming at [Blesedell] and making threats and saying [Blesedell] splashed him with water" in the Mega Surplus lot. Blesedell backed away from Riehle, who was allegedly threatening Blesedell. Riehle's account, on the other hand, paints Blesedell as the aggressor. After Blesedell left the Exchange and before he reached Stevens on the telephone, Riehle called CTC's service center to report the incident with Blesedell. Stevens was made aware of the call and listened to the recording of the call before talking to Blesedell. Riehle alleged that in the Mega Surplus lot, Blesedell splashed Riehle by speeding through a large puddle. Riehle then followed Blesedell to the Exchange, where Riehle allegedly found Blesedell in a car "snorting pills." Riehle also accused

Blesedell of threatening Riehle and of giving company cable to customers in exchange for drugs.

The last relevant event before Blesedell's termination occurred two days after the fact-finding meeting, on Sunday, December 16. On that day, CTC's service center received several telephone calls from a caller identifying himself as "Carrolls."[1] In the first call, the caller stated that he "need[ed the dispatcher] to write up a ticket because there was a truck that come through and hit some of the drops"[2] on December 2. The caller explained that "[w]e flagged a fellow down on Tuesday the 4th and he come and got most of th[e drops]." The caller also emphasized the importance of the fact that the technician completed the work on December 4: "So make sure that they know some of them was completed on the 4th." The caller further stressed: "Just make sure they know we flagged him down, type that in there and he'll know that they got some of them . . . ." When asked by the dispatcher, the caller did not provide a telephone number and stated that his address was "between 890 and 337" on Moss Hollow Road. The caller also asked the dispatcher to send someone the following day to repair more telephone lines.

The caller contacted the service center again soon after the first call, asking for a ticket number so that he could call back on the following day. The caller then volunteered that he "went ahead and hung some of the[ ] [lines] up." The call ended after the caller received a ticket number. Brad Carroll, the purported caller, testified that the voice on the first call was his, but that he was not sure about the voice on the second call. Blesedell testified that he did not make the calls.

On the morning of December 17, 2012, CTC's service center manager told Stevens that the voice on the calls received the previous day resembled Blesedell's voice. After listening to the calls, CTC employees Stevens, Coe, Kendall, and Parker agreed. Stevens then called a meeting to terminate Blesedell's employment with CTC. CTC's termination letter explained to Blesedell that the company had "learned of and ha[d] reason to believe that you are falsifying records and impersonating customers to explain your time spent on December 4, 2012." These actions, the letter continued, violated several of CTC's rules of conduct.

The applicable collective bargaining agreement (CBA) establishes a four-step grievance procedure. Immediately after Blesedell's termination, Union President Morgan pursued Steps 1 and 2 by filing a grievance on December 18 and meeting with Stevens on December 19 to ask that Blesedell be reinstated with a last-chance agreement. Stevens declined to reinstate Blesedell. During the December 18 meeting, Morgan also requested documents related to the termination. The requested documents included Blesedell's personnel file, documents and audio files referring to the termination, written statements by management concerning the incidents leading up to termination, and information about who participated in the termination decision and how the decision was made. In addition, Morgan requested a chronology of events related to Blesedell's dis-

---

1. Although the record contains three recordings, the second and third recordings may constitute one phone call. The break in the recording is probably due to the dispatcher placing the caller on hold.

2. The applicable collective bargaining agreement defines a drop as "a length of fiber or copper cable, aerial or buried," running "from the serving terminal to the point of demarcation at the customer premise." A drop is a technical term that customers would not typically use.

charge. That document, which was written by Stevens, contains one statement related to the trouble ticket that Blesedell instructed dispatcher Barnes to modify on December 14. The statement provides: "The belief is Jason, having the ability to do so, went into the [computer] system and wrote the notes [on the ticket] after our meeting on 12–14–12." Blesedell's defamation claim is based in part on this statement.

After Blesedell's termination, Morgan asked Blesedell to prepare a statement explaining his work on the afternoon of December 4. Blesedell gave Morgan the statement on December 27. The statement provides that on the afternoon of December 4, while waiting to receive trouble tickets from dispatcher Mitchell, Blesedell "shot trouble on 'C' box cable pairs"[3] at the Exchange, "was [then] flagged down by Mr. Carroll" and secured telephone lines on Carroll's property for "10–15 minutes," and returned to the Exchange to fill out a timecard. The statement then explains, for the first time, that Susan Mankin, a former CTC customer who lived near the Exchange, asked Blesedell about switching her telephone services after Blesedell returned from Carroll's house. Blesedell then allegedly walked to Mankin's house to check on the services. The statement makes no mention of Blesedell's performing pedestal work on Frank Robinson's property. Turning to December 16, the day of the telephone calls, the statement explains that Brad Carroll came to Blesedell's house to talk about low telephone lines and that Carroll used Blesedell's phone to call CTC's service center. In addition to Blesedell's statement, Blesedell gave Morgan affidavits from Carroll and Mankin that corroborate Blesedell's version of the events. Blesedell also obtained an affidavit from Robinson at some

later, unidentified date. Robinson's affidavit explains that on December 4, Robinson made contact with Blesedell at the Exchange and watched Blesedell repair the pedestal on Robinson's property, which is 150–200 yards from the Exchange.

After reviewing these statements, Morgan determined that Blesedell's version of the events was not credible. Morgan's review of the GPS records led him to conclude that Blesedell went to Carroll's house at 3:22 P.M., fixed low lines, and returned to the Exchange at 3:37. Blesedell's allegations of additional work gave Morgan pause. During his investigation, Morgan drove between Robinson's house, Mankin's house, and the Exchange. After doing so, Morgan concluded that it was not possible for Blesedell to walk to Mankin's house, check on Mankin's services, return to the Exchange, walk to Robinson's house to repair the pedestal, and submit a timecard electronically, all between 3:37 and 4:04 P.M. Morgan's experience working for CTC also suggested that Blesedell would have driven his vehicle to Mankin's and Robinson's houses so that he could have his tools and set out cones. Also suspicious to Morgan was that Blesedell never mentioned going to Mankin's house until after he was terminated. Morgan did not ask Blesedell about the inconsistencies and did not interview Mankin or Robinson.

By the time the grievance was filed, Morgan and Ervin had listened to the December 16 calls. Both concluded that the caller was Blesedell. Morgan's conclusion was based on the caller's voice, the caller's use of phrases that Blesedell often used, and the caller's insistence on explaining events on December 4, a date that had recently been the subject of a fact-finding meeting. This opinion was confirmed when Morgan briefly talked with Blesedell

---

**3.** This involved repairing cable pairs at the Exchange.

and Carroll by telephone on December 17. To Morgan, Carroll "sounded older, and he had a higher pitched voice."

On January 7, 2013, the Union and CTC held a meeting under Step 3 of the grievance procedure. At the meeting, the Union and CTC reviewed the evidence supporting Blesedell's termination in addition to evidence unrelated to the termination that might have nonetheless been relevant at arbitration, including the Riehle incident and several customer complaints involving Blesedell. CTC reaffirmed its termination decision. Following the meeting, Morgan wrote Blesedell: "Had your meeting today, company did not change their position, I will keep you posted." On January 24, the Union's grievance committee, which consisted of Morgan, Ervin, and three other Union officers, met to determine whether to take Blesedell's grievance to arbitration, the fourth step of the grievance procedure. Morgan presented his conclusions and CTC's evidence, including the recordings of the December 16 calls. The committee members agreed that the December 16 caller sounded like Blesedell and that Blesedell's account of the events on December 4 conflicted with the evidence. The committee was also concerned that Blesedell's story had changed several times. The committee nonetheless asked CTC to hold the Step 3 process open while the committee determined what weight to give to a recently issued Ohio unemployment-benefits decision in Blesedell's favor. The Union was soon advised by a member of the international union that the benefits decision would probably not be admissible at arbitration. Another individual from the international union also suggested that based on his experience in similar cases, Blesedell would not prevail at arbitration. After receiving this advice, the grievance committee met again and voted not to take the grievance to arbitration.[4] The committee relied in particular on the GPS records for Blesedell's vehicle, the December 16 calls, Blesedell's inability to prove where he was on December 4, and the modification of the trouble ticket for the pedestal work. According to Morgan, even if the benefits decision would be admissible at arbitration, the committee did not believe that Blesedell could overcome the fact that the December 16 caller sounded like Blesedell. The Union advised Blesedell at the end of January that it would not arbitrate the grievance.

The final event relevant to this case occurred on January 30, when Blesedell contacted Deputy Jenna Hornyak in the local sheriff's office to report that he had been threatened by Riehle on December 14, 2012. In her investigation, Deputy Hornyak called Stevens. According to Deputy Hornyak's notes of the conversation, Stevens "stated that [Blesedell] got fired because of statements from individuals telling [Stevens] that [Blesedell] was selling parts for drugs." This statement provides one of the bases for Blesedell's defamation claim against Stevens.

In May 2013, Blesedell brought suit in federal district court against CTC, the Union, and Stevens. The first count, a hybrid § 301/fair-representation claim, alleged that CTC breached the CBA in violation of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, by discharging Blesedell without just cause, and that the Union did not fairly represent Blesedell in the grievance process. The second count alleged that Stevens defamed Blesedell in

---

4. Blesedell questions whether a second meeting ever occurred. Although Morgan did not remember a second grievance committee meeting, every other committee member remembered one. Even if this meeting did not occur, this is not a material fact for the reasons explained below in Part I.A.

conversations with Deputy Hornyak and Union officers Morgan and Ervin. The district court granted summary judgment to all defendants. The court first concluded that CTC had just cause for termination based on its belief that Blesedell had submitted a false time card, modified the pedestal ticket, and impersonated a customer. The Union did not breach its duty of fair representation, according to the court, because the Union's conduct during the grievance was not arbitrary, discriminatory, or in bad faith. As for the defamation claim premised on Stevens' statement to Deputy Hornyak, the district court held that the statement was true and that Stevens was protected by a qualified privilege. The court also concluded that Stevens' statements to the Union—which included statements related to the modified trouble ticket and the Riehle incident—were not actionable. These statements, too, the court held, were true or were protected by a privilege.

## I.

■ Blesedell's hybrid claim fails because the Union did not breach its duty of fair representation in the grievance process. A plaintiff may prove breach of duty by showing that "the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir.2003) (citing *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). Arbitrariness, discrimination, and bad faith each provides a separate route by which a plaintiff may prove breach. *Id.* (citing *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir.1994)). Our de novo review confirms that none of the three bases for proving breach is present here. Moreover, because a hybrid claim requires proof of both breach of the union's duty and breach of the CBA by the employer,

*see Garrison*, 334 F.3d at 538 (citation omitted), Blesedell's claim fails based on our conclusion regarding the Union's representation. We therefore need not address whether CTC discharged Blesedell without just cause.

## A.

■ First, the Union did not act arbitrarily in representing Blesedell during the grievance process. The Union's officers reviewed CTC's evidence, compared Blesedell's statement describing the events on December 4 to CTC's evidence, took the grievance through the first three steps of the grievance procedure, and consulted two individuals from the international union. A union acts arbitrarily only if its conduct "is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (citation omitted). Blesedell argues primarily that the Union did not investigate his December 4 work and the December 16 telephone calls, failed to involve him in the grievance process, and failed to contest CTC's evidence. None of these arguments satisfies Blesedell's heavy burden of proving irrational conduct.

■ Because the Union investigated Blesedell's grievance enough to reasonably conclude that the grievance lacked merit, the investigation does not provide a basis for challenging the Union's representation. The duty of fair representation requires a union to undertake a reasonable investigation to defend a union member, *see Walk v. P*I*E Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir.1992) (citation omitted), not an error-free one, *see Garrison*, 334 F.3d at 538 (citation omitted). By the time Blesedell was terminated on December 17, Morgan and Ervin had reviewed Blesedell's timecard, the GPS records for Blese-

dell's vehicle, and Blesedell's explanations in the December 14 fact-finding meeting regarding his whereabouts on December 4. During the grievance process, five Union officers unanimously concluded that Blesedell was the caller in the December 16 calls. Morgan also investigated the grievance by requesting all of the information in CTC's possession concerning Blesedell's termination and reviewing this information before the meeting of the Union's grievance committee on January 24. In addition, Morgan requested Blesedell's version of the events on December 4 and evaluated that statement as well as the corroborating affidavits from Mankin and Carroll. Morgan arrived at the conclusion that Blesedell's statement was not credible after doing the following: determining where Mankin and Robinson lived; calculating the distances between Mankin's house, Robinson's house, and the Exchange; noting that it was unusual for Blesedell not to take his vehicle to Mankin's and Robinson's houses; assessing the relevant time frame based on the GPS records; recognizing that Blesedell had not previously mentioned checking telephone lines at Mankin's house; and noticing that the pedestal work that Blesedell had mentioned in the December 14 fact-finding meeting was absent from Blesedell's written statement.

■ Even though a more perfect investigation would have involved interviewing Mankin, Robinson, and Carroll to ask about Blesedell's work for them, the Union was not required to conduct a perfect investigation. The key question is whether the Union's decisions were irrational. *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127. "[U]nion agents are not lawyers," and "mere negligence or poor judgment" alone is not sufficient to prove breach of duty. *Danton v. Brighton Hosp.,* 335 Fed.Appx. 580, 586 (6th Cir.2009) (citations omitted). Morgan's failure to interview Mankin during the grievance process was not irrational, because Morgan had reviewed Mankin's affidavit and concluded based on the other evidence in the case that the affidavit was not credible. Whether or not Morgan had the Robinson affidavit during the investigation, Morgan's decision not to interview Robinson was likewise not irrational. Morgan had heard Blesedell's account of the pedestal work in the December 14 meeting, and during his investigation Morgan accounted for Blesedell's allegations regarding pedestal work on the afternoon of December 4. Nor was the investigation arbitrary on the basis that Morgan failed to ask Carroll whether Carroll made the December 16 telephone calls. The conclusions of five Union officers and five members of CTC's management that Blesedell was the caller gave the Union a solid basis for believing that this was the case. The Union thus did not act arbitrarily in investigating the grievance.

■ Moreover, the Union's investigation does not provide a basis for proving breach for another reason: no evidence suggests that a more thorough investigation would have caused the Union to arbitrate the grievance. In addition to proving arbitrary, discriminatory, or bad-faith conduct, a hybrid-claim plaintiff must prove that a union's actions or omissions "more than likely affected" the outcome of the grievance procedure. *Dushaw v. Roadway Express, Inc.,* 66 F.3d 129, 132 (6th Cir.1995) (citation omitted). Blesedell has not made this showing. Nothing indicates that more interviews of witnesses or more fact-checking would have changed the Union's decision not to arbitrate the grievance. This distinguishes this case from the cases that Blesedell cites. In *Black v. Ryder/P.I.E. Nationwide Inc.,* for instance, we upheld a jury verdict for a plaintiff asserting a § 301/fair-representation claim, reasoning that the plaintiff could prove breach of the

union's duty based on the union's failure to interview one key witness. 15 F.3d at 585. We held that the union's conduct probably affected the outcome of the grievance, and relied on a company manager's testimony at trial that he would have "reconsider[ed] whether to discharge [the plaintiff]" if he had heard the missing witness's version of events during the grievance process. *Id.* In reaching this conclusion, however, we explicitly recognized that in many cases, a union does not breach its duty by deciding not to interview a particular witness. *Id.* In another hybrid-claim case, *Schoonover v. Consolidated Freightways Corp. of Delaware,* we upheld a jury verdict for a plaintiff, reasoning in part that the union knew that the testimony of a missing expert witness "was crucial." 147 F.3d 492, 496 (6th Cir.1998). Neither *Black* nor *Schoonover* governs this case, as none of the Union's alleged failures in the investigation would have affected the outcome of Blesedell's grievance. *Black* is further distinguishable on the basis that there the union had received no information from the missing witness. 15 F.3d at 585. In this case, by contrast, the Union had received and reviewed affidavits from Blesedell's witnesses.

In addition to reasonably investigating the grievance, the Union also adequately involved Blesedell in the grievance process. Following the termination meeting on December 17, Morgan requested from Blesedell a written version of the events of December 4, thereby giving Blesedell a chance to tell his side of the story. Between the termination and the Union's Step 3 meeting with CTC on January 7, Blesedell and Morgan exchanged several emails related to the grievance. These emails concerned Blesedell's written statement, the state unemployment-benefits decision, and a recording of the Step 3 meeting. Although Blesedell faults Morgan for not allowing Blesedell to attend the Step 3

meeting with CTC, it was Stevens who prevented Blesedell from entering company property. Nor was Blesedell ever in the dark about when meetings were scheduled to occur or the outcome of the meetings. Finally, even though Blesedell was prevented from attending the grievance committee meetings at the end of January, the record indicates that the Union has a policy against grievants' attending these meetings. Good reasons support this practice, including the fact that this may better preserve the integrity of the committee's decision-making.

■ Our decision in *Whitten v. Anchor Motor Freight, Inc.,* 521 F.2d 1335 (6th Cir.1975), strongly supports the conclusion that the Union was not required to involve Blesedell more heavily in the grievance process. In *Whitten,* we held that a union did not act arbitrarily by neglecting to inform the grievant of a meeting between the company and union agents, by failing to give the grievant notice that the union would not pursue the grievance to arbitration, and by failing to answer the grievant's letters concerning the status of the grievance. *Id.* at 1341. We reasoned that the union's mere negligence in keeping the grievant informed about the grievance process was not enough to prove breach of duty. *Id.* As described above, the Union here did much more to involve Blesedell in the grievance than the union did in *Whitten.* Blesedell's involvement in the process was not so limited as to reflect arbitrary action by the Union.

Lastly, the Union did not act arbitrarily by deciding not to dispute more forcefully CTC's evidence and by neglecting to give Blesedell's statement and supporting affidavits to CTC. By the time of the Step 3 meeting with CTC in January, Morgan and Ervin had reviewed CTC's evidence presented at the December 17 termination

meeting. Because Morgan reasonably believed that the December 16 calls posed an insurmountable hurdle in Blesedell's case, it was not irrational for the Union to fail to challenge more energetically the termination decision. Even though Morgan did not give CTC the written statements from Blesedell, Mankin, Carroll, and Robinson, this too was not irrational. Morgan testified that in his view, the evidence was not "that relevant," a conclusion that was based on his belief that Blesedell's statement did not square with CTC's evidence. Nor is it likely that Morgan's failure to give Blesedell's evidence to CTC influenced the outcome of the grievance process. Nothing in the record indicates that this evidence would have caused CTC to reconsider the decision that Blesedell falsified a timecard. Similarly, it is unlikely that Carroll's affidavit, which states that he reported low telephone lines to CTC's service center on December 16, would have changed the conclusions of five members of CTC's management that Blesedell was the caller.

 The Union's decision not to arbitrate Blesedell's grievance was based on the Union's reasoned judgment that Blesedell could not prevail. There is therefore a world of difference between this case and cases like *Linton v. United Parcel Service,* where a union decided to drop a grievance for reasons unrelated to the merits of the grievance. 15 F.3d 1365, 1371–72 (6th Cir. 1994). "Any substantive review of a union's performance must be highly deferential, recognizing the wide latitude that [union] negotiators need...." *Id.* at 1369. Applying this principle to the facts of this case compels the conclusion that the Union's actions were not arbitrary.

### B.

 Neither of the remaining two options for proving breach of the Union's duty—discriminatory treatment and bad faith—is present in this case. Blesedell's affirmative request that the Union arbitrate his grievance does not make the Union's conduct discriminatory. To show discriminatory treatment, Blesedell must prove that the discrimination was "intentional, severe, and unrelated to legitimate union objectives." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers,* 613 F.3d 609, 619 (6th Cir.2010) (citation omitted). Here, the Union's decision to drop the grievance was related to legitimate objectives because the Union reasonably concluded that Blesedell could not win at arbitration. This conclusion was supported by the opinion of an international union member that the unemployment-benefits decision would not be admissible at arbitration. Also supporting the committee's conclusion was the opinion of an international union representative who had extensive experience with similar grievances. Moreover, Blesedell cannot show disparate treatment relative to other grievants. In discovery, Morgan identified two former employees whose grievances Morgan did not take to arbitration. Like Blesedell, neither grievant asked that the grievance be dropped. That these grievants did not specifically ask the Union to arbitrate the grievance does not support a finding that Blesedell was treated in a discriminatory fashion. "A union does not ... have to exhaust every possible remedy requested by a member facing disciplinary action." *Walk,* 958 F.2d at 1326 (citation omitted). In addition, at oral argument and in his briefs, Blesedell has been unable to show why his affirmative request to arbitrate materially distinguishes his grievance from the other grievances that the Union also declined to arbitrate.

 Lastly, the grievance process was not tainted by bad faith on the part of Morgan. First, Morgan's removal of

Blesedell as a Union steward at some point before the events giving rise to this suit does not establish bad faith during the grievance process. Morgan had authority to remove stewards at any time and he removed Blesedell for a legitimate reason—Morgan believed that Blesedell was undermining Morgan's authority as the Union's business manager. Moreover, Morgan testified that he harbored "no ill-will, no dislike, [and] no bias" against Blesedell. Second, Blesedell's allegation that Morgan's handling of the grievance was based on Morgan's desire for a management position with CTC is not sufficient to establish bad faith. It is true that Morgan applied for non-union management positions with CTC in 2011 or 2012. Morgan testified, however, that his desire for a management position during that time did not affect his ability to represent Union members. Even if Morgan was still interested in a non-union position at the time of Blesedell's grievance, we have held that a "sweetheart" relationship between an employer and a union officer does not prove bad faith absent additional evidence of personal animosity. *See Whitten,* 521 F.2d at 1341. No such evidence exists here.

Because Blesedell cannot prove that the Union's conduct was arbitrary, discriminatory, or in bad faith, the hybrid claim is without merit.

## II.

 Summary judgment was also proper regarding Blesedell's defamation claim against Stevens. That claim is premised on statements that Stevens made to Deputy Hornyak and to Union officers Morgan and Ervin after Blesedell's termination. Proving defamation under Ohio law requires a plaintiff to show that "a publication contains a false statement . . . reflecting injuriously on a person's reputa-

tion, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *Jackson v. Columbus,* 117 Ohio St.3d 328, 883 N.E.2d 1060, 1064 (2008) (citation omitted). Even a false statement may be protected by a qualified privilege, which applies in certain contexts where a statement was made without actual malice. *Id.* None of Stevens' statements is actionable, as the statements are true, are protected by a qualified privilege, or were first published by Blesedell.

Although Stevens' statement to Deputy Jenna Hornyak may be false in one sense and true in another, the defamation claim fails under either reading. This claim is based on Deputy Hornyak's notes from her conversation with Stevens about the Riehle incident. Those notes provide: "Eric [Stevens] stated that Jason [Blesedell] got fired because of statements from individuals telling him that Jason was selling parts for drugs." Stevens testified that during the conversation, he mentioned Riehle's allegations about theft but did not say that Blesedell was terminated *because of* Riehle's allegations. This case arises in a summary judgment posture, and we therefore assume that Deputy Hornyak's notes are accurate.

 There are two senses in which Stevens' statement to Deputy Hornyak could be false. Under the first reading, Stevens' statement is false because it states the wrong reason for Blesedell's termination: Blesedell was not terminated due to Riehle's allegations, but due to the falsified timecard and the December 16 calls. The catch, however, is that Blesedell told Deputy Hornyak thirty minutes before her conversation with Stevens that Blesedell was fired from CTC due to the Riehle incident. Blesedell's statement, then, is the same false statement that Stevens allegedly made. Ohio law protects

individuals from false statements that reflect poorly upon the individual's reputation or affect the individual adversely in his profession. *Jackson*, 883 N.E.2d at 1064. A plaintiff may therefore prove defamation only if the third party receiving the publication understands its defamatory meaning. *Cooper v. Grace Baptist Church of Columbus, Ohio, Inc.*, 81 Ohio App.3d 728, 612 N.E.2d 357, 362 (1992). After hearing Blesedell say that he was fired due to the Riehle incident, Deputy Hornyak would not have suspected that Stevens' later statement to the same effect was defamatory. If the defamation claim is based on this reading of Stevens' statement, the claim is without merit.

■ Stevens' statement could also be false in another sense if Stevens told Deputy Hornyak that Blesedell was selling company parts for drugs. But Stevens did not do this. Stevens relayed only "statements from individuals" alleging that Blesedell had sold parts for drugs. Stevens' statement to Deputy Hornyak did not suggest that Riehle's allegations were true. Because Stevens truthfully reported that an individual made an allegation about Blesedell, Blesedell cannot prove defamation based on Deputy Hornyak's notes.

■ Also without merit is Blesedell's defamation claim premised on Stevens' statements to the Union. Those statements are true or protected by a qualified privilege. Blesedell faults Stevens for discussing two incidents. First, Blesedell claims that Stevens should not have let Morgan listen to the recording of Riehle's telephone call to CTC during the Step 2 meeting, and that Stevens should not have discussed Riehle's call during the Step 3 meeting with Morgan and Ervin. Stevens did not make a false statement, however, by playing the recording of Riehle's telephone call. Stevens' act of playing the recording did not suggest that Stevens

believed that Riehle's allegations were true. Nor does any evidence in the record suggest that Stevens told the Union that Blesedell was snorting pills or trading company cable for drugs. Because there was no false statement, Stevens' conversations regarding the Riehle incident are not actionable.

■ Second, Blesedell claims that Stevens published defamatory material by telling Morgan and Ervin that Blesedell probably directly manipulated the trouble ticket related to the alleged pedestal work. Stevens wrote: "The belief is Jason, having the ability to do so, went into the [computer] system and wrote the notes [on the ticket] after our meeting on 12–14–12." Even assuming that this statement is false—a point we do not decide—the statement is protected by a qualified privilege. Ohio extends a privilege to statements made in good faith, where "an interest [is] to be upheld, [the] statement [is] limited in its scope to this purpose, [there is] a proper occasion, and publication [is] in a proper manner and to proper parties only." *Jackson*, 883 N.E.2d at 1064 (citation omitted). Stevens' statement satisfies this standard. CTC had good reason to provide information related to the modified ticket because a federal labor statute required CTC to give the Union all information relevant and useful to Blesedell's grievance. *Gen. Motors Corp. v. NLRB*, 700 F.2d 1083, 1088 (6th Cir.1983) (citation omitted). The modified ticket was relevant to Blesedell's grievance, as the ticket related to Blesedell's explanation of what work he did on December 4. Stevens' statement about the ticket was published only to necessary parties, the Union officers in charge of the grievance. Finally, Stevens' statement was limited in scope because it was couched as a "belief."

■ Although a plaintiff may defeat a claim of privilege by proving actual mal-

ice, Stevens did not have this state of mind when making the above statement to the Union. Actual malice requires knowledge of falsity or a reckless disregard of falsity. *Jackson*, 883 N.E.2d at 1064 (citation omitted). After finding the ticket in CTC's computer system on December 14, Stevens asked two of the dispatchers with whom Blesedell regularly worked whether they had changed the ticket. Neither one had done so. Stevens then asked an employee with computer access equivalent to Blesedell's to attempt to modify a ticket. After learning that the employee was able to do so, Stevens reasonably concluded that Blesedell directly changed the ticket. Stevens had no reason to believe that Blesedell had called dispatcher Barnes and asked her to change the ticket. Because Stevens' statement to Morgan and Ervin was privileged and because Blesedell cannot overcome the privilege by proving actual malice, the defamation claim falls short.

The judgment of the district court is affirmed.